**Opinion issued November 14, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00251-CR

————————————

**TROY WILLIAMS II, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 182nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1248664**

## OPINION

A jury convicted Troy Williams II of first degree murder, and the trial court assessed his punishment at eighteen years' confinement. On appeal, Williams contends that (1) the trial court erred in denying his motion for a mistrial during

voir dire, granting the State's challenge for cause of a venire person, and denying his motion for mistrial during closing argument, and (2) he received ineffective assistance of counsel.

We affirm.

## Background

Avila's neighbor, Juan Machado, testified that he was awakened one December morning between 5:00 and 6:00 a.m. by loud noises from the apartment above his that sounded "like a fight or a struggle." He then heard Avila "crying out for help" in Spanish. He estimated that Avila cried out for help about ten times with a steady stream of "screaming and moaning." He also heard another voice coming from the apartment saying, "Shut up," in Spanish. Machado called emergency assistance. The noises continued for about ten minutes and then stopped. He then called emergency assistance a second time when he "started hearing the struggle again." The fighting ended with a final, louder noise. When police officers eventually arrived at the scene, Machado told them what he had heard.

Houston Police Department Officer J. Vasquez testified that he and Officer Z. Wang received a dispatch at 6:49 a.m. to a disturbance at the apartments. As they arrived on the scene at 6:54, they passed Williams walking away from Avila's apartment. Williams was carrying his shoes and some shirts, and had blood stains

2

on his socks and upper body. Vasquez placed Williams in the patrol car, told Wang to check Avila's apartment, and released Williams shortly thereafter. Upon entering the apartment, Vasquez found Avila lying on a bed with blood "all on his head," "all over [the] side of the bed on the floor," and dripping off of Avila. Vasquez said that Avila appeared to be the victim of an "assault" or a "beating," rather than a fight. Believing that Williams may have had something to do with the scene, Vasquez instructed Wang to find him. Wang reported over the radio that Williams was running away, and when Vasquez caught up to them, Wang had Williams in custody. They then turned Williams over to homicide detectives.

HPD Officer A. Taravella, who also was dispatched to the scene, testified that he saw "drops of blood" and "blood spatter" on the wall and headboard of the bed. He also seized two cellular telephones, one from inside the apartment and one that Officer Wang had recovered from Williams. He observed several disks of pornography that appeared to be "recently watched," a plate with what appeared to be cocaine residue, a used condom, and a twenty-pound dumbbell. Based on the blood, a broken lamp, and a sofa cushion that was no longer on the couch, he believed "some sort of struggle" had taken place. Taravella testified that he believed that Avila had been struck in the head approximately five or six times and moved to the bed after he was first injured. HPD Crime Lab DNA analyst Clay

3

Davis testified that Avila's DNA was found on the dumbbell and on Williams's clothes, chest, and hands.

HPD Homicide Detective P. Motard interviewed Williams the same day. He testified that Williams was "argumentative, erratic," "almost nonsensical," and "had blood scattered all over his body." An ambulance transported Williams to a hospital, but Motard did not notice that he was cut or bruised. Motard obtained DNA samples of the blood on Williams's clothing. Once at the hospital, Williams did not claim that he had been sexually assaulted and resisted medical treatment.

Albert Chu, an assistant medical examiner at the Harris County Institute of Forensic Sciences, performed an autopsy of Avila. Chu testified that Avila's cause of death was "[b]lunt force injuries of the head and neck" consistent with a homicide. Avila had two fractures to his skull, bleeding on the surface of his brain, and some bruising of his brain. Avila's head had lacerations with "a similar shape to what was seen on the edges of the dumbbell." Chu opined that Avila had been struck with a dumbbell or another blunt object at least three or four times. Chu also noted compression of Avila's neck, indicating strangulation. He characterized bruising on Avila's right middle finger and left forehand as injuries likely "sustained in the course of defending one's self." Cocaine and alcohol were both present in Avila's system at the time of his death.

Williams testified in his defense.  By way of background, he testified that his father was a chaplain who raised him in a "very religious" household with "very strict" rules. His parents disapproved of his uncle's homosexuality, and they did not interact with his uncle for years because they would not allow him to bring "a homosexual partner" to their home.  Williams testified that he also disapproved of his uncle's lifestyle.

After playing basketball in high school, Williams attended Baylor University, where he started using marijuana and ecstasy and got suspended for stealing a laptop. He then attended Houston Baptist University but was expelled when he was discovered with marijuana.

On the day of Avila's death, Williams was nineteen years old and living in an apartment with the financial assistance of his parents. He testified that he used ecstasy twice daily.

Williams testified that he had not met Avila before the day in question. On the evening before Avila's death, Williams was picked up by his friend, "Toya," because his automobile was being repaired.  He had already taken marijuana and ecstasy. At her apartment, they used marijuana, consumed alcohol, played dominoes,  and "hung out" with some of her friends for several hours.  Williams left Toya's apartment after midnight because one of her male friends was "hitting on" him, making him uncomfortable.  Toya declined to give Williams a ride home,

5

but two women in the parking lot whom he had never met before agreed to drop him off near his apartment complex. When he could not find his apartment keys, he went to a friend's apartment but she was not home. His phone had a dead battery; therefore, he could not call anyone else.

At approximately 4:00 or 5:00 a.m., Williams went back down to the parking lot of his friend's apartment complex, where he started talking with an African-American man and a Hispanic man, later identified as Avila. Williams asked them if they could give him a ride to his parent's house in Fort Bend County or a place to stay because he was cold; the African-American man declined, but Avila agreed to Williams's request to stay in his apartment.

Once inside, Avila offered Williams cocaine, but he declined. After Avila went into the kitchen, Williams laid on the couch in the living room and fell asleep, still fully clothed. Williams testified that he later realized that Avila was removing his sweatshirt and shirt as Williams was sleeping. Williams did nothing about it; he was "letting it go" because "[i]t didn't bother" him. When he awoke again, his shirt, shorts, and shoes had been removed, and Avila was performing oral sex on him. Williams pushed Avila off of him. According to Williams, Avila got up off the floor and punched him, and the two started fighting. At some point during the fight, Williams picked up a twenty pound dumbbell from the hallway; he began "swinging away" with the dumbbell and knocked Avila's teeth out. After

6

Williams "managed to get on top" of Avila and "pin him" lying face down, he repeatedly hit Avila with the dumbbell and did not stop until he "knew he was dead." After initially objecting to re-enacting the blows with a dumbbell because it would "incriminate me," Williams demonstrated the force he used to hit Avila by hitting a piece of wood. Williams testified that he killed Avila because he "wanted to make sure" he would "[s]top trying to sexually assault me."

Williams conceded that the front door to the apartment was less than twenty steps away, that Avila was about four inches smaller than him and in his forties, yet he claimed that Avila "was stronger" than him. He also recalled that Avila was "yelling for help" at some point. He acknowledged that Avila "needed help because [Williams] was beating him." Williams testified that "striking [Avila] in the back of the head with a dumbbell numerous times until he died was immediately necessary to defend [him]self."

Using Avila's cellular telephone, Williams attempted to call his family and a friend around 6:00 a.m., but none of them answered. He did not call 911. Near 7:00 a.m, he put his shorts on and walked out of the apartment, carrying his shirt, shoes, and Avila's cellular telephone.

As he left the apartment, he was confronted by Officers Vasquez and Wang and said, "I was kidnapped. It was self-defense." The police officers allowed him to leave, but shortly thereafter Wang "came after [him]." Williams ran but Wang

7

caught him and placed him under arrest. Williams testified that he asked to be taken to the hospital because he was "ashamed" and "didn't want them to know that [he] was sexually assaulted."

When Williams was interviewed by HPD, he told the officers that he had been kidnapped, Avila had threatened to call his uncle, and he had "lightly" hit Avila with the dumbbell. He later admitted that his "elaborate story . . . was full of lies." He "had no problem putting that story together," and claimed that he fabricated the story because he was ashamed that he had been sexually assaulted. He denied having sex with Avila, but did tell the officers that Avila was "touching on me." Similarly, he testified that he never told his parents or family members what happened before the trial because "they would look at me different" and he "didn't want anybody to label me . . . as being gay." He also testified that he asked to be taken to the hospital to get away from the police station, but he "didn't feel comfortable" telling the health care providers about the sexual assault. He conceded that his testimony at trial that he had been sexually assaulted was the first time anyone other than his lawyers had heard this version of the events. He also testified on re-direct examination that he initially did not even tell his lawyer the "truth."

Williams also testified about his trial preparation. He had a copy of the police report. He listed to his recorded statement "a few times," and "practice[d]"

8

his testimony. He asserted, however, that he "wouldn't make up a story to not go to prison."

On cross-examination, Williams admitted that he committed a number of extraneous offenses. He was expelled from Baylor University because he stole a laptop and several students' wallets, for which he was placed on deferred adjudication for theft. Williams also pled guilty to and received deferred adjudication for a theft at a Wal-Mart convenience store. He was later expelled from Houston Baptist University because he was found in possession of narcotics.

After Williams testified, several of his family members and acquaintances testified to his religious upbringing, including his father, a chaplain.

The State called Latoya Jones to testify on rebuttal on the issue of Williams's response to homosexuals. Jones first met Williams a month or two before Avila's death. Jones was "openly gay," and on the night in question, she and Williams went to the apartment of her friend "Calibra," a man who was also openly gay. She testified that, at some point, Calibra began "hitting on" Williams, but Williams did not appear to be bothered by it.

## Prosecutor's Statement during Voir Dire

In his first issue, Williams argues that the trial court erred in denying his motion for a mistrial after the prosecutor told the venire panel "that he would have dismissed the case if he did not think that Williams was guilty."

9

*Comments to the venire*

Williams first complains of the following statements made to the venire panel during voir dire:

| | |
|---|---|
| [STATE]: | My duty is to prove my case. What should I—if I don't believe this case—look, I'll tell you right now. If I don't believe this case and I don't think that the defendant's guilty, what should I have already done? |
| [VENIREPERSON]: | Not charged him. |
| [STATE]: | We dismiss cases— |
| [DEFENSE COUNSEL]: | Your Honor, I object. This voir dire— |
| [TRIAL COURT]: | Sustained. It's not argument. |
| [DEFENSE COUNSEL]: | And I ask the Court to instruct the jury to disregard the prosecutor's statements. |
| [TRIAL COURT]: | Okay. Please disregard the last comment of [the prosecutor's] opinion. |
| [DEFENSE COUNSEL]: | Ask for a mistrial, Your Honor. |
| [TRIAL COURT]: | Overruled. |

*Standard of review*

We review the trial court's denial of a defendant's motions for mistrial for an abuse of discretion. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999);

10

*Woodall v. State*, 77 S.W.3d 388, 399 (Tex. App.—Fort Worth 2002, pet. ref'd). A trial court may declare a mistrial when an error occurs that is so prejudicial that the expenditure of further time and expense would be wasteful. *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000). Whether a trial court abused its discretion in denying a motion for mistrial depends on whether the court's instruction cured any prejudicial effect. *Dinkins v. State*, 894 S.W.2d 330, 357 (Tex. Crim. App. 1995); *Faulkner v. State*, 940 S.W.2d 308, 312 (Tex. App.—Fort Worth 1997, pet. ref'd). Generally, an instruction to disregard cures the prejudicial effect. *Dinkins*, 894 S.W.2d at 357; *Woodall*, 77 S.W.3d at 399. However, a comment may be so egregious or inflammatory as to render the instruction ineffective in curing the prejudice. *Dinkins*, 894 S.W.2d at 357; *Woodall*, 77 S.W.3d at 399.

### The prosecutor's comments were improper but did not require a mistrial

A prosecutor may not inject personal opinion in statements to the jury. *Johnson v. State*, 698 S.W.2d 154, 167 (Tex. Crim. App. 1985), *cert. denied*, 479 U.S. 871 (1986); *Tucker v. State*, 15 S.W.3d 229, 236 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). Such a statement improperly conveys the idea that the prosecutor has a basis for such an opinion outside the evidence presented at trial. *See Wyatt v. State*, 566 S.W.2d 597, 604 (Tex. Crim. App. 1978).

Here, the prosecutor's statement to the venire that he would have dismissed the case against Williams if he believed he was innocent constituted an improper expression of his personal opinion that Williams was guilty. *See, e.g., Beltran v. State*, 99 S.W.3d 807, 811–12 (Tex. App.—Houston [14th] Dist. 2003, pet. ref'd) (holding that prosecutor's statement during voir dire that he would not be there if he did not believe defendant was guilty was improper); *Campos v. State*, 946 S.W.2d 414, 415–18 (Tex. App.—Houston [14th Dist.] 1997, no pet.) (holding that prosecutor's statement that "we wouldn't be here" if he did not believe defendant was guilty was improper).

But the trial court made a prompt instruction to disregard the comment and specifically noted that the comment only constituted the prosecutor's opinion. Under similar circumstances, Texas courts have held that a prompt instruction to disregard cures any resulting harm. *See Wilkerson v. State*, 510 S.W.2d 589, 591–92 (Tex. Crim. App. 1974) (holding that trial court's instruction to disregard cured any harm resulting from prosecutor's statement that "I feel like from what I know about the case the man is guilty"); *Cox v. State*, No. 14-94-00476-CR, 1997 WL 563149, at *5 (Tex. App.—Houston [14th Dist.] Sept. 11, 1997, pet. ref'd) (not designated for publication) (holding that trial court's instruction to disregard cured any harm resulting from prosecutor's statement that he knew "beyond a reasonable doubt" that he would prove every element of the alleged crime); *Zaiontz v. State*,

12

700 S.W.2d 303, 307 (Tex. App.—San Antonio 1985, pet. ref'd) (explaining that harm resulting from prosecutor's comment that he "wouldn't be here if [he] didn't believe the Defendant to be guilty" could have been cured by instruction). Williams does not cite any cases in which similar voir dire statements were held to be incurable by a prompt jury instruction.

From this record, we cannot conclude that the prosecutor's brief statement was so egregious or inflammatory that it was not cured by the trial court's instruction to disregard. Accordingly, we hold that Williams has not demonstrated that the trial court abused its discretion and overrule Williams's first issue.

## Challenge for Cause

In his second issue, Williams argues that the trial court erred in granting the State's challenge for cause of veniremember 28 who had been convicted of indecent exposure. The State asserted that the crime constituted "a conviction for a crime of moral turpitude," and the trial court granted its challenge-for-cause.

### Should the trial court have excused the juror?

To show error in a trial court's grant of a state's challenge of a potential juror for cause, a defendant must demonstrate one of two things: (1) the trial judge applied the wrong legal standard in sustaining the challenge or (2) the trial judge abused his discretion in applying the correct legal standard. *Jones v. State*, 982 S.W.2d 386, 388 (Tex. Crim. App. 1998). The erroneous excusing of a potential

13

juror will call for reversal only if the record shows that the error deprived the defendant of a lawfully constituted jury. *Id.* at 394.

A challenge for cause may be made of a veniremember if he has been convicted of misdemeanor theft or any felony. TEX. CODE CRIM. PROC. ANN. art. 35.16(a)(2) (West 2011). Indecent exposure constitutes a Class B misdemeanor. TEX. PENAL CODE ANN. § 21.08(b) (West 2011). Williams argues that, because indecent exposure is only a misdemeanor and the Texas Code of Criminal Procedure does not excuse veniremembers based on misdemeanors of moral turpitude, the trial court erred in granting the State's challenge for cause regardless of whether indecent exposure constitutes a crime of moral turpitude. The State argues that the trial court was, nevertheless, entitled to grant the State's challenge for cause under the Texas Government Code, which states that a person is disqualified to serve as a juror unless, among other provisions, the person is "of sound mind and good moral character." *See* TEX. GOV'T CODE ANN. § 62.102(4) (West 2011).

### *Any error was harmless*

Assuming, without deciding, that the trial court erred in granting the State's challenge for cause of veniremember 28, we must disregard a trial court error in granting a State's challenge for cause unless it affected the defendant's substantial rights. TEX. R. APP. P. 44.2(b). A defendant does not have the right to have any

14

particular individual sit on the jury; rather, a defendant's "only substantial right is that the jurors who do serve be qualified." *See Jones*, 982 S.W.2d at 393. Thus, "the erroneous excusing of a veniremember will call for reversal only if the record shows that the error deprived the defendant of a lawfully constituted jury." *Id.* at 394; *see also Gray v. State*, 233 S.W.3d 295, 301 (Tex. Crim. App. 2007) (holding that trial court's erroneous exclusion of potential juror for economic reasons did not merit reversal because defendant did not show he did not "received a trial by an impartial jury comprised of qualified individuals"). If the jurors who serve are qualified, then the jury is lawfully constituted, the defendant's substantial rights are not affected, and reversal of the defendant's conviction based on the erroneous granting of a challenge for cause is not required. *Jones*, 982 S.W.2d at 394; *Moore v. State*, 54 S.W.3d 529, 538 (Tex. App.—Fort Worth 2001, pet. ref'd).

Here, Williams does not show that he was deprived of a lawfully constituted jury. Accordingly, we hold that any error in the trial court's granting of the State's challenge for cause of veniremember 28 would be harmless. *See Gray*, 233 S.W.3d at 301; *Jones*, 982 S.W.2d at 394; *Moore*, 54 S.W.3d at 538.

We overrule Williams's second issue.

### Closing Argument

In his third issue, Williams argues that the trial court erred in denying his motion for mistrial after the State "argued during summation that Williams was

15

able to fabricate a defense through defense counsel's access to the State's open file."

### *The argument was improper*

Proper jury argument is generally limited to (1) a summation of the evidence presented at trial, (2) reasonable deductions drawn from that evidence, (3) answers to opposing counsel's argument, and (4) pleas for law enforcement. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000) (en banc); *Swarb v. State*, 125 S.W.3d 672, 685 (Tex. App.—Houston [1st Dist.] 2003, pet. dism'd). A trial court has broad discretion to control the scope of closing argument. *Lemos v. State,* 130 S.W.3d 888, 892 (Tex. App.—El Paso 2004, no pet.); *see Herring v. New York*, 422 U.S. 853, 862–63, 95 S. Ct. 2550, 2555–56 (1975). The State is afforded wide latitude in its jury arguments and may draw all reasonable, fair, and legitimate inferences from the evidence. *Allridge v. State*, 762 S.W.2d 146, 156 (Tex. Crim. App. 1988). The State may not, however, use closing argument to "strike" at a defendant over the shoulders of his counsel or accuse counsel of bad faith. *Magana v. State*, 177 S.W.3d 670, 674 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *see also Mosley v. State*, 983 S.W.2d 249, 258–59 (Tex. Crim. App. 1998).

A prosecutor runs the risk of improperly "striking" at a defendant over the shoulders of counsel when the argument is made in terms of defense counsel personally or when the argument explicitly impugns defense counsel's character.

*Mosley*, 983 S.W.2d at 259; *Magana*, 177 S.W.3d at 674–75. "[A]rguments attacking defense counsel are improper because they unfairly inflame the jury against the accused." *Wilson v. State*, 7 S.W.3d 136, 147 (Tex. Crim. App. 1999). It is, however, permissible for a prosecutor to attack the defense's argument. *See Brown v. State*, 270 S.W.3d 564, 572 (Tex. Crim. App. 2008); *Magana*, 177 S.W.3d at 675.

Specifically, Williams complains of the following statement made during closing arguments:

| [STATE]: | What did the defendant have access to before trial? He's had years to craft a story. As we said in voir dire, we have an open file policy. They have access to copies of police reports, statements, and photos. They can build a whole defense that fits everything that we have. That's just how the game is. It doesn't mean they get credit for it or you believe it. |
|---|---|
| [DEFENSE COUNSEL]: | Your Honor, that's striking at the defendant. It's improper argument. |
| [TRIAL COURT]: | Sustained. |
| [DEFENSE COUNSEL]: | Ask the Court to instruct the jury— |
| [TRIAL COURT]: | Disregard the last comment made by the prosecutor. And overruled. |
| [DEFENSE COUNSEL]: | And I ask for a mistrial. |
| [TRIAL COURT]: | Overruled. |

17

| [STATE]: | Well, the defendant told you from the witness stand he's read his statement. And the expert told you he had access to all the records and tapes. This defendant would not admit anything on cross-examination that made him look bad. Not a thing. In fact, I thought it was very telling. |
|---|---|

The State's argument was not limited to conduct by a singular person, the defendant. The prosecutor argued that "they" have access to the file and "they" can build a defense. The trial court sustained the objection and instructed the jury to disregard the prosecutor's statement.

***The trial court did not abuse its discretion in denying the motion for mistrial***

The trial court sustained Williams's objection but denied his motion for mistrial. Williams contends that the argument was egregious and harmful and, therefore, incurable.

When, as here, the trial court instructs the jury to disregard improper argument, the proper analysis is whether the trial court abused its discretion by denying the motion for mistrial. *Archie v. State*, 340 S.W.3d 734, 738–39 (Tex. Crim. App. 2011); *Hawkins v. State*, 135 S.W.3d 72, 76−77 (Tex. Crim. App. 2004); *Carballo v. State*, 303 S.W.3d 742, 748 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). We must uphold the trial court's ruling denying a motion for

18

mistrial if it was within the zone of reasonable disagreement. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007).

A mistrial is an extreme remedy and should be exceedingly uncommon. *See Hawkins*, 135 S.W.3d at 77 (stating that a mistrial is required only "in extreme circumstances, where the prejudice is incurable"); *see also Bauder v. State*, 921 S.W.2d 696, 698 (Tex. Crim. App. 1996), *overruled on other grounds by Ex parte Lewis*, 219 S.W.3d 335, 337 (Tex. Crim. App. 2007). A mistrial is required only when the impropriety is clearly calculated to emotionally inflame the jurors' minds and is of such a character as to suggest the impossibility of withdrawing the impression produced on the jurors' minds, *Hinojosa v. State*, 4 S.W.3d 240, 253 (Tex. Crim. App. 1999), or when the impropriety is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Hawkins,* 135 S.W.3d at 77 (quoting *Ladd*, 3 S.W.3d at 567); *Archie*, 340 S.W.3d at 739.

"In most instances, an instruction to disregard the remarks will cure the error." *Wesbrook,* 29 S.W.3d at 115; *see e.g., Moore v. State,* 999 S.W.2d 385, 405–06 (Tex. Crim. App. 1999), *cert. denied*, 530 U.S. 1216 (2000) (concluding that instruction to disregard cured harm from comment on defendant's failure to testify); *Kemp v. State,* 846 S.W.2d 289, 308 (Tex. Crim. App. 1992) (concluding that testimony referring to inadmissible extraneous offense was rendered harmless by instruction to disregard because testimony "was no[t] so inflammatory as to

undermine the efficacy of the trial court's instruction to disregard"); *Brown v. State*, 769 S.W.2d 565, 567 (Tex. Crim. App. 1989) (holding that improper argument that jury consider parole law was not of such nature that trial court's curative instruction did not remedy error). Indeed, "[a]lmost any improper argument may be cured by an instruction to disregard." *Garcia v. State*, 943 S.W.2d 215, 217 (Tex. App.—Fort Worth 1997, no pet.). As this court has previously explained:

> [W]e presume that a jury will obey a trial court's instruction to disregard unless "the evidence is clearly calculated to inflame the minds of the jury and is of such a character as to suggest the impossibility of withdrawing the impression produced on their minds." Only an extremely inflammatory statement overcomes this presumption.

*Johnson v. State*, 01-07-00461-CR, 2009 WL 1331857, at *4 (Tex. App.—Houston [1st Dist.] May 14, 2009, pet. ref'd) (mem. op.) (not designated for publication) (citations omitted).

Thus, only in the most egregious cases when there is an "extremely inflammatory statement" is an instruction to disregard improper argument considered an insufficient response by the trial court. *Moore,* 999 S.W.2d at 405-06 (quoting *Waldo v. State,* 746 S.W.2d 750, 753 (Tex. Crim. App. 1988)); *Johnson,* 2009 WL 1331857, at *4; *see also Dinkins,* 894 S.W.2d at 357 (explaining that only in most blatant examples will courts find instruction to disregard inadequate to cure comment on failure to testify). Otherwise, the Court

20

of Criminal Appeals "has tended to find [a curative] instruction to have force." *Moore,* 999 S.W.2d at 405.

The Court of Criminal Appeals has identified three factors to balance in determining whether the trial court abuses its discretion in denying a motion for mistrial: (1) the "severity of the misconduct" (also defined as "the magnitude of the prejudicial effect of the [State's] remarks"), (2) the curative measures taken by the trial court, and (3) the certainty of conviction absent the conduct. *Archie,* 340 S.W.3d at 739; *Hawkins*, 135 S.W.3d at 77 (stating analysis for closing arguments in punishment phase of trial); *accord Brown*, 270 S.W.3d at 572–73 (applying same analysis in guilt phase of trial). In examining the severity of the argument, we review whether it appears that the improper arguments were "a willful and calculated effort on the part of the State to deprive [Williams] of a fair and impartial trial." *Brown,* 270 S.W.3d at 573 (internal quotation omitted).

Turning to the first factor—the severity of the misconduct—the trial court could have reasonably concluded that the State's improper argument was not so egregious as to indicate a willful and calculated effort to inflame the jurors' minds or of such character as to suggest the impossibility of withdrawing the impression produced in their minds.

The State's argument would not have been improper if it had merely pointed out that Williams fabricated a story; argument during summation that a defendant

21

has lied is allowed. *See Smith v. State*, 898 S.W.2d 838, 846 & n.8 (Tex. Crim. App. 1995) (noting that State has right during closing argument to "attack the veracity of a defendant who takes the stand"); *Greer v. State*, 523 S.W.2d 687, 690–91 (Tex. Crim. App. 1975) (holding that, where defendant takes witness stand, it is not reversible error for prosecutor to attack veracity of defendant). But the State went too far when it switched to the pronoun "they" and suggested that defense counsel was involved in helping Williams "craft a story" by taking advantage of the open file policy. A statement accusing defense counsel of manufacturing evidence is inappropriate. *See McMurrough v. State*, 995 S.W.2d 944, 947 (Tex. App.—Fort Worth 1999, no pet.). Nonetheless, the offending statement still must be "extremely inflammatory" to cause an instruction to disregard to be ineffective and require a mistrial. *Johnson*, 2009 WL 1331857, at *4 ("Only an extremely inflammatory statement overcomes" the presumption that a jury "will obey" a curative instruction).

We therefore must review the evidence, which establishes the context of the challenged statement, and the entire final argument during which the statement was made. First, Williams admitted at trial that his original statement to the police was "full of lies" and seemed "ridiculous" but that he had "no problem putting that story together" to avoid disclosing what occurred in Avila's apartment. Second, Williams admitted that he never told police, doctors, family or friends before trial

that he was sexually assaulted by Avila. Third, Williams testified at length that he had reviewed the police report and his statements to the police as part of his trial preparation. Thus, from the evidence the jury knew that Williams had ample opportunity to—and had—changed his version of the events after he reviewed the police file. And, in closing argument, his counsel argued that Williams had told a story "that was ridiculous, that makes no sense at all. It's all over the world. It's not a story that would get someone out of trouble. It's a story to get someone in trouble." Defense counsel later argued that Williams made such statements because he was "in shock."

When viewed in context of the evidence—against the backdrop of Williams's admission that he lied, that he had reviewed the police file, and that no one had heard his trial version of the events in question before his testimony—the statement that the defense crafted a story based on the police file falls short of being "extremely inflammatory." A review of the complete final argument also suggests that this particular statement was not so severe as to constitute an extremely inflammatory statement. The first sentence of the portion of the argument in question refers to "the defendant" having access to the State's open file. The prosecutor said next that "[h]e's had years to craft a story" based on access to that file. Both statements are supported by the evidence. The three sentences that follow, in which the prosecutor improperly used "they" instead of

23

"he," would have been permissible if the prosecutor had referred to Williams alone. Further, the State did not flagrantly refer to Williams's attorney directly, which counsels against a conclusion that the statements were so extremely inflammatory that a jury could not follow an instruction to disregard them. *See Owens v. State*, 381 S.W.3d 696, 707 (Tex. App.—Texarkana 2012, no pet.) (examining flagrancy of violation). Finally, the prosecutor did not repeat the improper argument once the court sustained the objection and instructed the jury to disregard. *Id*. (examining persistence of prosecutor and flagrancy of violation). All of this supports a conclusion that the improper argument was not severe.

The argument here has some similarities to the argument examined in *Whitney v. State*, 396 S.W.3d 696, 703–06 (Tex. App.—Fort Worth 2013, pet. ref'd). In that case, the prosecutor stated, during closing argument, that the defendant changed her story regarding the events of a murder "after four or five visits at the defense attorney's office." *Id.* at 703. The trial court sustained the defendant's objection but denied her motion for a mistrial. *Id.* The court of appeals did not read the prosecutor's statement as directly striking at the defendant's counsel:

> Although it would not be unreasonable to infer that she changed her story after consulting with defense counsel, it does not necessarily follow that she did so at the counsel's direction. Nor did the prosecutor argue that counsel directed her to change her story. . . . The cases showing strikes over the shoulders of counsel have been more directly aimed at counsel than this.

24

*Id.* at 705. Moreover, the record supported that prosecutor's argument. The *Whitney* court assumed, nonetheless, that the argument was improper, but concluded that the trial court did not abuse its discretion by denying the motion for mistrial. In weighing the first factor—the severity of the misconduct—the court noted that the remark "was not severe or unduly prejudicial" and "did not inject anything into the trial of which the jury was previously unaware." *Id.* at 706. The same is true here.

Williams cites four cases for the proposition that a prosecutor's attack on defense counsel's integrity "is so prejudicial that it cannot be cured by an instruction to disregard and requires a mistrial upon request." We believe the cases are distinguishable. In *Fuentes v. State*, 664 S.W.2d 333, 335 (Tex. Crim. App. 1984), the attorney's statement was directed at counsel and was particularly egregious.[1] Moreover, the prosecutor's statement "was not an isolated incident, but was indicative of what transpired throughout the trial." *Id.* at 337. In *Lopez v. State*, 705 S.W.2d 296, 298 (Tex. App.—San Antonio 1986, no pet.), the

---

[1]     The prosecutor made an objection during cross-examination of a State's witness by saying, before the jury, "Oh, Judge, we object to that, he is in bad faith like usual and we object to it. That is a bunch of garbage and he knows it." *Fuentes v. State*, 664 S.W.2d 333, 335 (Tex. Crim. App. 1984).

prosecutor "repeatedly attacked the lawful efforts of defense counsel to represent his client."[2] Unlike these two cases, the improper argument here was not repeated.

Williams's two other cases likewise are distinguishable. In *Branson v. State*, 825 S.W.2d 162 (Tex. App.—Dallas 1992, no pet.), the prosecutor claimed twice, during argument, that defense counsel had "lied" to the jury and made "constant frivolous objections." *Id.* at 164–65. The court of appeals stressed that "the prosecutor repeated the accusation that defense counsel was lying, even when faced with sustained objections and instructions to disregard." *Id.* at 166. The court held that, "[c]onsidering the repetition and nature of the improper argument," the defendant was denied a fair and impartial trial. *Id.* at 167. In the last case cited by Williams, *McMurrough*, 995 S.W.2d at 947–48, the attorney did not repeat the improper argument, but the jury sent a note inquiring into the substance of the comment during its deliberations. Noting the jury's inquiry, the court concluded that the error could not have been cured by an instruction and had "a significant and injurious affect on the verdict such that [the defendant's] substantial rights were affected." *Id.* at 948. These four cases do not change the rule that a mistrial in response to a final argument that attacks defense counsel and is immediately

---

[2]     For example, the prosecutor told the jury, during closing argument, that they had evidence implicating the defendant that he could not present "because of all the objections." *Lopez v. State*, 705 S.W.2d 296, 298 (Tex. App.—San Antonio 1986, no pet.). Immediately after, the prosecutor stated that "the entire strategy of defense counsel" was "to keep as much evidence from you as possible." *Id.*

followed by an instruction to disregard is the exception to the rule, and not the rule itself.[3]

We recognize that courts must have "special concern" for final arguments that include "unsubstantiated accusation[s] of improper conduct directed at a defendant's attorney." *Orona v. State*, 791 S.W.2d 125, 128 (Tex. Crim. App. 1990). But that does not mean that we can ignore the *Mosley* three–prong test for determining if improper argument is harmful. For example, in *Orona*, the Court of Criminal Appeals found that an improper argument by the prosecutor that the defense lawyer knew how to argue "to get people off" was harmless even though it was overruled. Similarly, in *Mosley* the Court of Criminal Appeals again held that improper jury argument was harmless even though the court overruled the objection. *Mosley*, 983 S.W.2d at 260. The prosecutor there also used the pronoun "they." He argued, "The defense has attempted to get you off the main road, to divert you. They don't want you to stay on the main road because they know where that will take you . . . . They want you to take a side road, a series of side roads, rabbit trails, and a rabbit trail that will lead you to a dead-end." *Id.* at 258. The

---

[3] *Sunday v. State*, 745 S.W.2d 436, 440 (Tex. App.—Beaumont 1988, pet. ref'd), is likewise distinguishable. The court there held that the prosecution improperly attacked defense counsel during final argument when the prosecutor stated that defendant asserted his defensive theory only after hiring an attorney. A mistrial was required because the trial court refused to give the requested curative instruction. *Id.*

Court held that the argument was improper because it referred "to counsel personally." *Id*. at 259. The Court did not hold that the improper jury arguments striking over the shoulders of counsel are per se so egregious as to require reversal. Instead, it identified and applied the balancing factors and concluded that the improper argument was harmless.

We conclude that the first *Mosley* factor—the severity of the misconduct—is close, but does not compel a conclusion that the trial court was required to grant a mistrial.

The second factor—the measures taken to cure the misconduct—also supports a conclusion that the trial court did not abuse its discretion in denying the motion for mistrial. The trial court "immediately ordered the jury to disregard it." *Whitney*, 396 S.W.3d at 706. Not only did the trial court sustain the objection, it orally informed the jury before final arguments that the attorney's arguments are "not evidence. It's simply their summary of what they believe the evidence has shown." The court had earlier instructed the jury during the voir dire "what the lawyers say is not evidence. . . . What the witnesses say is evidence. So, bear in mind that just what the witnesses say is the evidence." Similarly, the court had twice instructed the jury during the evidence phase of the trial, in sustaining an

objection by the State, that the lawyers' statements did not constitute evidence.[4] The court also instructed the jury that the lawyers' statements are not evidence after sustaining Williams's objection to certain evidence.[5] The court's written jury instructions again advised the jury that it should not "consider, discuss, nor relate any matters not in evidence." Thus, we can presume from the cumulative weight of these six instructions that the jury understood that the State's improper comments were not evidence, and that its decision should be based only on the evidence.

Courts also examine whether the prosecutor "revisit[ed] this line of argument." *Id.*; *see also Owens*, 381 S.W.3d at 706–07 (examining persistence of prosecutor); *Robertson,* 100 S.W.3d at 41–45 (same); *Adams,* 156 S.W.3d at 156–58 (same); *Carnell v. State*, No. 01-11-00252-CR, 2012 WL 1655548, *1–3 (Tex. App.—Houston [1st Dist.] May 10, 2012, pet. ref'd) (mem. op.) (not designated for publication) (same). Here the trial court immediately instructed the jury to disregard the statement and the State did not repeat it. The second factor supports the trial court's ruling.

---

[4]   The first time the trial judge stated, "What the lawyers say is not evidence. So, please don't consider it as such." The second time she stated, "Again, what the lawyers say is not evidence."

[5]   "What the lawyers say is not evidence. So, please don't consider it as such." She gave the same instruction on at least two other occasions after sustaining an objection by Williams.

The third factor—the certainty of conviction absent the misconduct—supports a conclusion that the trial court did not abuse its discretion. Ample evidence supported the jury's finding of guilt. Williams admitted that he killed Avila. Williams admitted that he had already told an elaborate story full of lies to the police and also admitted he never claimed self-defense to a sexual assault to anyone other than his lawyers—not even his family or friends—before trial. And the evidence showed that Williams did not merely fend off Avila; he bludgeoned Avila with a dumbbell while pinning him down. Under these circumstances, the State's improper use of the pronoun "they" instead of "he" was unlikely to strongly influence the jury's analysis of Williams's credibility.

Finally, we decline Williams's invitation to reverse for the purpose of deterring future improper jury argument by the State. He contends that if we do not conclude that the trial court abused its discretion, "the State can and most certainly will" make this argument "in every case in which a defense is presented without fear of reversal." But no authority allows us to base our holding on concerns over hypothetical consequences in future cases. Indeed, recent Court of Criminal Appeals authority teaches that courts should confine their analysis to the case at issue, without regard to whether declaring an error harmless encourages its repetition in the future. *See Snowden v. State*, 353 S.W.3d 815, 820–22 (Tex. Crim. App. 2011) (rejecting consideration of "probable collateral implications" of finding

30

harm in case of constitutional error including "whether declaring the error harmless would encourage the State to repeat it with impunity" and concluding that the harmless–error inquiry "should adhere strictly to the question of whether the error committed in a particular case contributed to the verdict obtained *in that case*"); *Mason v. State*, 322 S.W.3d 251, 257 n.10 (Tex. Crim. App. 2010) ("the [*Harris*] factor of 'whether declaring the error harmless would encourage the State to repeat it with impunity' is misplaced when addressing nonconstitutional error under Rule 44.2(b)").

Thus, whether a trial court must grant a motion for mistrial even after instructing a jury to disregard an improper jury argument is a case specific inquiry, and our analysis should be directed only to the argument in this case. *See generally Mosley*, 983 S.W.2d at 259–60 (holding that improper final argument is not constitutional error but is instead error reviewed under Rule 44.2(b), and then adopting three–fold test for reviewing whether improper argument substantially affected defendant's rights).

### *Conclusion*

Viewing the State's closing argument in its entirety, we cannot conclude that the trial court abused its discretion in denying the motion for mistrial. We are guided by long-established precedent on the standard of review for determining whether the trial court—which observed the entirety of the trial—abused its

discretion. Our task is not to determine whether we disagree with the trial court's ruling, but whether the trial court's determination was beyond the zone of reasonable disagreement. *See Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007) (reviewing court cannot substitute its judgment for that of trial court, but instead determines whether trial court's decision was arbitrary or unreasonable). *Cf. Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002) (an appellate court "cannot substitute its judgment for the trial court's reasonable judgment even if it would have reached a contrary conclusion.").

In light of this standard, our review of the record as a whole does not indicate that the State's remark was of the tenor to require a mistrial. And there is no evidence suggesting that the jury considered this improper remark or that it disregarded the court's instruction to disregard. A reasonable trial judge could have concluded that its instruction cured the prejudice caused by the State's improper argument. Balancing all the factors, we hold that the trial court did not abuse its discretion in denying the motion for mistrial. *See Bauder*, 921 S.W.2d at 698 (holding that mistrial is extreme remedy for prejudicial events that occur at trial, and should be exceedingly uncommon).

We overrule Williams's third issue.

## Ineffective Assistance of Counsel

In his fourth issue, Williams argues that he received ineffective assistance of counsel at trial because his trial counsel elicited, opened the door to, and failed to object to inadmissible and prejudicial testimony.

The standard of review for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). *Strickland* generally requires a two-step analysis in which a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) but for counsel's unprofessional error, there is a reasonable probability that the result of the proceedings would have been different. *Id.* at 687–94, 104 S. Ct. at 2064–68; *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. In reviewing counsel's performance, we look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that his performance falls within the wide range of reasonable professional assistance and trial strategy. *See Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006); *Thompson*, 9 S.W.3d at 813. Williams has the burden to establish both prongs by a preponderance of the evidence. *Jackson v. State,* 973 S.W.2d 954, 956 (Tex. Crim. App. 1998).

A failure to make a showing under either prong defeats an ineffective-assistance claim. *See Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003). Moreover, allegations of ineffectiveness must be firmly founded in the record. *Thompson*, 9 S.W.3d at 814; *Bone v. State*, 77 S.W.3d 828, 835 & n.13 (Tex. Crim. App. 2002). When the record is silent, we may not speculate to find trial counsel ineffective. *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001). In the absence of evidence of counsel's reasons for the challenged conduct, an appellate court commonly will assume a strategic motivation if any can possibly be imagined and will not conclude that the challenged conduct constituted deficient performance unless the conduct was so outrageous that no competent attorney would have engaged in it. *See id.*

### Officer's Testimony

Williams first complains of his trial counsel's failure to object to the following testimony of HPD Officer R. Moreno:

| [STATE]: | If you had had questions at all about whether it was self-defense, would you have done anything different in your investigations? |
|---|---|
| [OFFICER MORENO]: | Yes, sir. |
| [STATE]: | What would you have done? |
| [OFFICER MORENO]: | I would have notified the District Attorney's Office, explained the facts to the District Attorney. Normally we |

34

call chiefs that are on duty. And this would have probably been a grand jury referral rather than charges being filed in the manner that they were.[6]

The expression of guilt or innocence in any case is a conclusion to be reached by the jury based upon the instructions given them in the court's charge, coupled with the evidence admitted by the judge through the course of the trial. *Taylor v. State*, 774 S.W.2d 31, 34 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd). No witness is competent to voice an opinion as to guilt or innocence. *Boyde v. State*, 513 S.W.2d 588, 590 (Tex. Crim. App. 1974).

A lay witness may testify, however, "to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact at issue." TEX. R. EVID. 701. Opinion testimony that is otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact. TEX. R. EVID. 704.

Here, Officer Moreno, who was called to the stand by Williams, testified at length on direct examination regarding his inspection of the scene at Avila's apartment. He testified that it appeared "something sexual" occurred at the scene

---

[6] In his initial briefing to this Court, Williams also complains of several references by HPD officers to the complainant's apartment as a "crime scene" and Officer Vasquez's opinion that the complainant appeared to be the victim of "an assault" or "a beating;" however, in his reply briefing to this Court, Williams abandons the allegations of deficient performance with regard to that testimony.

35

but that it did not appear to be a "normal sexual assault." And, at the time, Williams had not asserted to Officer Moreno that he had been acting in self-defense; he only asserted that he had been kidnapped. Under these circumstances, trial counsel could have concluded that the officer's testimony was admissible as a lay opinion regarding the scene at Avila's apartment considering that Williams had not yet claimed self-defense. *See Ex parte Nailor*, 149 S.W.3d 125, 134 (Tex. Crim. App. 2004) (holding admissible officer's opinion testimony that defendant had not been attacked); *Solomon v. State*, 49 S.W.3d 356, 364–65 (Tex. Crim. App. 2001) (holding admissible officer's testimony that defendant was "responsible for [the complainant] getting robbed"); *Bryant v. State*, 340 S.W.3d 1, 11–12 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (holding that police investigator's testimony that sexual assault had occurred admissible when given after "the factual background of a criminal investigation"). Accordingly, we hold that trial counsel was not ineffective on the ground that he failed to object to Officer Moreno's testimony.

### *Extraneous Acts*

Williams next complains that trial counsel erred in opening the door to evidence that Williams had been expelled from Baylor University for stealing a laptop computer and other students' wallets and from Houston Baptist University (HBU) for possession of narcotics. He also complains that trial counsel erred in

36

opening the door that he used narcotics "on a daily basis, carried a bag of ecstasy on his person, and aspired to be a drug dealer for awhile." Finally, Williams complains of trial counsel's failure to object to evidence "suggesting that [he] was affiliated with a gang." Williams contends that this extraneous evidence allowed the State to characterize him, in closing argument, as a liar, cheater, stealer, and "wannabe" narcotics dealer.

The State argues that Williams's trial counsel "may have reasonably believed that the door to the complained-of testimony would have likely been opened by testimony from Williams, or his witnesses, which included his mother and father, his uncle, and a former basketball coach" and chose to "bring it all out during Williams's direct-examination testimony before the State could, thereby giving the jury the impression that Williams and counsel were being open and honest about the disclosed facts."

On direct examination of Williams, trial counsel elicited that Williams was suspended from Baylor after six months for "stealing a laptop" and suspended from HBU. Trial counsel also elicited that, in 2007, Williams started smoking marijuana "about three times a day" and taking ecstasy "about twice a day." He eventually became employed at Home Depot, but quit because he "wanted to try to sell drugs." On cross-examination, Williams testified, without objection, that he was "kicked out" of Baylor for stealing a laptop and other students' wallets, for

which he received deferred adjudication. Williams further testified that he had received deferred adjudication for a second theft from a Wal-Mart store. He was "kicked out" of HBU because he was "caught with drugs on campus."

Evidence of extraneous offenses "is not admissible to prove the character of a person in order to show action in conformity therewith." TEX. R. EVID. 404(b). However, trial counsel's decision to not object to otherwise inadmissible extraneous offenses may constitute a sound and plausible trial strategy. *See, e.g., Heiman v. State*, 923 S.W.2d 622, 626 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd); *see also Hall v. State*, No. 01-09-00891-CR, 2010 WL 4121290, at *4 (Tex. App.—Houston [1st Dist.] Oct. 21, 2010) (mem. op.) (not designated for publication) ("The Court of Criminal Appeals has held that an 'undoubtedly risky' trial strategy that ultimately does not pay off is not necessarily unacceptable or 'wholly unjustified.'") (citing *Delrio v. State*, 840 S.W.2d 443, 446–47 (Tex. Crim. App. 1992) (per curiam)).

Williams's counsel could have reasonably believed that he needed to present evidence of Williams's drug use on the night in question to explain his behavior that night[7] as well as his "beating" of Avila. And once evidence of drug use was part of the defense's explanation of the events, it would not be unreasonable to

---

[7] Williams's version of the facts were that, after he had smoked marijuana and taken ecstasy, he became stranded at Avila's apartment complex and decided to spend the night sleeping on the sofa of a stranger.

conclude that, with the door opened, it would be better to show the jury the entire story—that Williams had a history of drug use. Counsel also could have concluded that a defense strategy of portraying a strict family environment that did not tolerate homosexuality would open the door to Williams's bad acts and, therefore, that it was better to introduce them on direct examination. Williams testified, as did numerous other relatives and friends, that he had been raised in a very strict household.

Likewise counsel could have concluded that evidence of his thefts were helpful to explain why Williams ran from police and did not immediately inform them of the sexual assault. As stressed in his closing argument, defense counsel was attempting to portray his client as being "open and completely honest with regard to all questions." *See Heiman*, 923 S.W.2d at 626; *Ahmadi v. State*, 864 S.W.2d 776, 783 (Tex. App.—Fort Worth 1993, pet. ref'd); *see also Villarreal v. State*, No. 14-00-00948-CR, 2001 WL 1249329, at *2–3 (Tex. App.—Houston [14th Dist.] Oct. 18, 2001, pet. ref'd) (mem. op.) (not designated for publication).

Williams also complains that his counsel elicited testimony about his desire to be a drug dealer. Williams testified that for "less than a month" his "aspiration was to be a drug dealer." He further testified

Q: Did you continue working at [Home Depot], or did you stop working there?

A: I stopped working there.

39

Q: Why did you stop working there?

A: Because I wanted to try to sell drugs.

Q: What kind of drugs were you going to sell?

A: Ecstasy.

Q: And were you good at it?

A: No, sir.

Q: Why not?

A: Because I used them.

An ineffective assistance of counsel claim examines the conduct of counsel, so our focus is not on the answer given by Williams but on whether counsel was ineffective in asking the question. The record does not reveal whether Williams's attorney expected this answer to his initial open-ended question about why Williams left his place of employment. Even assuming he did, he could have reasonably believed that this evidence fit his theme of a rebellious and irresponsible nineteen–year–old who never committed any violent crime.

In regard to evidence "suggesting that Williams was affiliated with a gang," Williams complains of his trial court's failure to object to the admission into evidence of two photographs procured from his Facebook or MySpace accounts. The prosecutor questioned Williams, without objection, regarding the photographs in the following exchange:

[STATE]:          This is you throwing gang signs after you were charged with murder, isn't it?

[WILLIAMS]:       That's not a gang sign.

[STATE]:          What is it?

[WILLIAMS]        Southwest.

[STATE]:          Representing the southwest side, right?

[WILLIAMS]:       That's me trying to be a gangster, but I'm from the suburbs.

[STATE]:          That's you trying to be a gangster after you were charged with murder, right?

[WILLIAMS]:       Trying to look like a gangster, right.

[STATE]:          Because you were proud of what you did?

[WILLIAMS]:       No, sir.

[STATE]:          That's you throwing a gang sign after you were charged with murder, isn't it?

[WILLIAMS]:       That's not a gang sign.

[STATE]:          What is that?

[WILLIAMS]:       I don't know what I was doing.

[STATE]:          You were just throwing up random signs?

[WILLIAMS]:       That just looks like a peace sign. . . .

On redirect examination, Williams testified that he did not know when the photographs were taken and he "took them off" MySpace or Facebook because they "didn't represent" who he was.

Gang affiliation may be considered evidence of an "other crime, wrong or act," subject to exclusion under Texas Rule of Evidence 404(b). *See Pondexter v. State*, 942 S.W.2d 577, 583–84 (Tex. Crim. App. 1996). Trial counsel may have opted not to object to the questioning because he did not want to call attention to the evidence. He could also have reasonably believed that Williams's own answers adequately dispelled the notion that he was affiliated with a gang.

From this record, we cannot conclude that trial counsel's eliciting testimony regarding Williams's prior thefts, use of drugs, and attempts to sell drugs, or his failure to object to pictures from Williams's MySpace or Facebook account were "so outrageous that no competent attorney would have engaged in it." *See Garcia*, 57 S.W.3d at 440. Accordingly, we hold that Williams has not established that he was deprived effective assistance of counsel with respect to those complaints.

### *Attorney-Client Privilege*

Williams next argues that his trial counsel was deficient in not objecting "to the prosecutor cross-examining Williams about privileged attorney-client communications" in the following exchange, presented without objection:

[STATE]: Did you have a copy of the police report?

[WILLIAMS]: I know I had one sheet that had all the stuff on there.

[STATE]: And you don't need to look at Mr. Schneider because I'm asking you the questions. You had a copy of the police report, isn't that right? It's just—and you're not in any trouble for that. I'm just asking a question.

[WILLIAMS]: I just remember my lawyers giving me a sheet with my testimony and whatever else was on there.

[STATE]: You've told—so, you got a chance to review all of that as well?

[WILLIAMS]: Yes, sir, I reviewed the packet.

[STATE]: How many times did you and the defense get together and really go over everything?

[WILLIAMS]: We got together a lot when the trial was about to— before the court dates were about to come up.

[STATE]: And you had a chance to practice what you were going to tell the jury, right?

[WILLIAMS]: I had a chance to practice, yes, sir, what happened.

The prosecutor later asked,

[STATE]: And you realized that when you were talking with your lawyers that what you said in that statement was ridiculous; isn't that right?

[DEFENSE COUNSEL]: Your Honor, I object to any question about talking to lawyers.

43

| [STATE]: | Sustained as to any conversations with lawyers. |

Later, a prosecutor asked Williams whether a "defense lawyer went over with you" the contents of his cellular telephone, to which Williams responded, "No, sir."

A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services. TEX. R. EVID. 503(b); *Austin v. State*, 934 S.W.2d 672, 673 (Tex. Crim. App. 1996). Therefore, application of the attorney-client privilege depends on whether the communication sought to be protected is "confidential." *Austin*, 934 S.W.2d at 674. A communication is "confidential" if it is not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client. *Id.* The client bears the burden of establishing the existence of the privilege. *Id.*

Here, Williams testified only that he reviewed his testimony and the police report with his defense counsel on several occasions. Williams did not divulge any confidential communications given to defense counsel or provided him by defense counsel. We do not think the testimony elicited from Williams in this case involved a disclosure which would "inhibit the normal communications necessary for the attorney to effectively represent the client." *Id.* From this record, we cannot conclude that the testimony was inadmissible or that trial counsel was ineffective

for not objecting to it. Accordingly, we hold that Williams has not established that he was deprived effective assistance of counsel at trial on the ground that trial counsel failed to object to the above testimony.

### Jones's Testimony

Finally, Williams complains that trial counsel did not object to testimony that his friend, Latoya Jones, "had never been convicted of a felony or a crime of moral turpitude" and "failed to prove that she had just completed a felony deferred adjudication probation."

Before Jones's testimony, during a recess, the State informed the trial court that Jones had "a forgery out of the 208th where she successfully completed a deferred. So, it's not a final conviction; and under Texas case law, that's not admissible." The State also noted that Jones "was not on deferred at the time that the offense was committed, either. It was completed in 2005."

At the outset of Jones's testimony, the State asked whether she had "ever been convicted of a crime, a felony or a crime of moral turpitude," to which Jones responded, "No." Williams complains that trial counsel was deficient in not questioning Jones "about the 2005 felony deferred adjudication probation after the State opened the door by creating the false impression that she had no criminal record."

45

Improper "bolstering" has been defined as "any evidence the *sole* purpose of which is to convince the factfinder that a particular witness or source of evidence is worthy of credit, without substantively contributing 'to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.'" *Rivas v. State*, 275 S.W.3d 880, 886 (Tex. Crim. App. 2009) (emphasis in original) (quoting *Cohn v. State*, 849 S.W.2d 817, 819–20 (Tex. Crim. App. 1993)); *see also Alley v. State*, No. 14-09-00846-CR, 2011 WL 664742, at *5 (Tex. App.—Houston [14th Dist.] Feb. 24, 2011, pet. ref'd) (mem. op.) (not designated for publication) (holding that trial court erred in overruling objection to prosecutor's question that witness had never been in trouble with the law or been convicted of any "felonies or crimes of moral turpitude"). The State argues that bolstering evidence is now admissible if it is relevant within the meaning of the Texas Rules of Evidence. *See* TEX. R. EVID. 401, 402. It further argues that the prosecutor's question to Jones was relevant "to the determination of the witnesses' credibility because it makes a fact of consequence, the credibility of the witness, slightly more probable than it would be without the evidence."

Assuming, without deciding, that the question posed to Jones was improper and trial counsel was deficient in not objecting to the question, Williams still must satisfy the second prong of *Strickland*. Under the second prong of *Strickland*, a

defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, ___U.S. __, 131 S. Ct. 770, 792 (2011).

Here, although the credibility of the witnesses, namely Williams, was critical to the case, much of Jones's testimony corroborated Williams's previous testimony regarding the incidents leading up to Avila's death. For example, Jones testified that she had provided Williams with ecstasy and smoked marijuana with him in the past, that she had smoked marijuana and taken ecstasy with Williams at a friend's apartment on the night of the incident, and that Williams left her friend's apartment shortly thereafter. Jones did testify, however, that her friend was "openly gay" and Williams did not appear to be "bothered" by that fact. Jones also testified that Williams told her he had a girlfriend, but when he spoke on the phone with that person, her voice sounded "masculine."

Jones's testimony constituted only a very small portion of the State's case and the evidence presented at trial. Much more time was spent describing the police officers' investigation of the scene at Avila's apartment and Williams's characterization of his religious upbringing. The State did not bring up Jones's

47

testimony or her credibility in final argument; it focused on Williams's version of the events by noting the number of times Avila was struck, the inconsistency of Williams's statements, and Machado's testimony that he heard someone calling for "help" in Spanish from the nearby apartment. And, finally, we believe that the State's single line of questioning pertaining to Jones's criminal history would not have greatly influenced the jury, particularly in light of Jones's admission that she used and provided illegal drugs to Williams. *See Jones v. State*, 38 S.W.3d 793, 797 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (stating that prosecutor's statement during closing argument that witnesses had no criminal record was "a weak attempt to bolster the witnesses' testimony"); *see also Alley*, 2011 WL 664742, at *8 ("The State did not emphasize Raymond's lack of a criminal history during its questioning of other witnesses or jury argument. Thus, it is unlikely the jury's decision to believe Raymond turned on his clean record.").

Thus, even assuming that trial counsel was deficient in not objecting to the prosecutor asking Jones whether she had been convicted of a felony or crime of moral turpitude, we hold that Williams has not established that, but for such error, if any, the results of the proceeding would be different. *See Perez*, 310 S.W.3d at 893.

We overrule Williams's fourth issue.[8]

## Conclusion

We affirm the judgment of the trial court.


Harvey Brown
Justice

Panel consists of Justices Jennings, Brown, and Huddle.

Justice Jennings, dissenting.

Publish.   TEX. R. APP. P. 47.2(b).

---

[8] Williams asks that, if this Court finds that the record is insufficient to establish deficient performance of his trial counsel, we abate the appeal and remand to the trial court for a hearing regarding his claim of ineffective assistance of counsel. In support of this argument, Williams relies on *Alvarez v. State*, 79 S.W.3d 679, 682 (Tex. App.—Houston [1st Dist.] 2002, pet. dism'd). However, in *Alvarez*, the defendant's trial counsel said during sentencing that he "probably wouldn't" pursue a motion for new trial on the grounds of ineffective assistance of counsel. *Id.* at 681. This Court held that the attorney's statement constituted a conflict of interest and abated the appear and remanded to the trial court for an opportunity to file a new motion for new trial.

Here, on the contrary, there is no indication in the record that Williams's trial counsel failed to discuss with his client or failed to pursue a motion for new trial on the ground of ineffective assistance of counsel. When the record does not reflect that trial counsel withdrew or was replaced by new counsel after sentencing, there is a rebuttable presumption that trial counsel continued to effectively represent the defendant during the time limit for filing a motion for new trial. *See Smith v. State*, 17 S.W.3d 660, 662 (Tex. Crim. App. 2000); *Oldham v. State*, 977 S.W.2d 354, 363 (Tex. Crim. App. 1998). As such, there is also a rebuttable presumption that the defendant was counseled by his attorney regarding the merits of the motion and ultimately rejected the option. *Oldham*, 977 S.W.2d at 363. And we note that Williams can always further develop the record in this regard through an application for a writ of habeas corpus. *See Jackson v. State*, 973 S.W.3d 954, 957 (Tex. Crim. App. 1998).