In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-24-00217-CR

TIMOTHY ALLEN HARRIS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
Jefferson County, Texas
Trial Cause No. F20-34740

## MEMORANDUM OPINION

Timothy Allen Harris appeals his conviction for the first-degree felony of aggravated assault of a family member, against his niece, "Tiffany". [1] *See* Tex. Penal Code Ann. § 22.02(b)(1). The indictment alleged that on or about March 20, 2020, Harris

---

[1] We refer to the victim by a pseudonym. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

intentionally and knowingly and recklessly cause[d] serious bodily injury to [Tiffany], . . . by the use of a deadly weapon, namely, a firearm, by shooting [Tiffany] in the back and with said firearm, and [Tiffany] [] is a family member as defined by Section 71.003 of the Texas Family Code[.]

The jury found Harris guilty as charged and assessed punishment at seventy-five years of confinement. The trial court sentenced Harris in accordance with the jury's verdict. Harris timely appealed raising three issues. We affirm the trial court's judgment.

Evidence at Trial

Tiffany testified that on March 20, 2020, the day she was shot by Harris, her uncle, she was thirteen or fourteen years old and living at Sunset Way Apartments with her mother and grandmother. Tiffany testified about the events that preceded the shooting. She recalled that she was at home that day with her great-grandmother while her mother was at work, and Harris and her grandmother picked them up from the apartment. Tiffany recalled they all went to Walmart, she and Harris dropped her grandmother and great-grandmother off at the nail salon, and she and Harris went to Harris's friend's house where Harris bought what Tiffany believed was synthetic marijuana, and then she and Harris went to a convenience store. Tiffany testified that she and Harris went back to the apartment, and he went to the patio and smoked the substance that she believed was synthetic marijuana. Tiffany recalled that Harris

2

often acted paranoid when he smoked synthetic marijuana, which occurred "[m]aybe every other day before this happened."

According to Tiffany, Harris came back inside acting paranoid, looked at her in a sexual way, acted angry, and pulled a gun out. She was scared and ran, but "by the time [she] took off, [she] was already shot." Tiffany testified that the first shot hit her in the back and then there were five or six more shots. She crawled outside of the house and ultimately collapsed outside. She recalled that people came to her aid at the scene, she told them what had happened, she went to the hospital, and an officer came to see her at the hospital. Tiffany agreed at trial that family members had tried to convince her to drop the charges against Harris. She also agreed that Harris had made statements to her admitting shooting her and told her that "things would be okay if [they] could just work it out[.]" Tiffany acknowledged that she watched some of the testimony from the prior day on YouTube, but she said that it did not impact her testimony.

Ricky Bass testified that on March 20, 2020, while in her apartment at Sunset Way Apartments, she heard a series of "booms," opened her apartment door and saw Tiffany, who lived in the same building, walking "wobbly[.]" Ricky called Calvin, her husband who did maintenance work at the complex, and told him he needed to come check because she initially thought Tiffany was "knocking on doors and running." Ricky testified that she saw Tiffany collapse near Building 3. According

to Ricky, she went back in and from her window she saw a man "hunched over" Tiffany and, although Ricky did not know at the time who the man was, she identified him at trial as the defendant, Harris. Harris was no longer near Tiffany when Ricky went to check on Tiffany, who was in pain and bleeding and said "Help, I've been shot[,]" and Ricky realized the "booms" she heard earlier were gunshots. Ricky's husband was already assisting Tiffany. Ricky testified she went back to her apartment to get her phone to call 911. She later saw Harris get into a car to leave but he was stopped by the police.

Calvin Bass, a maintenance man at Sunset Way Apartments on the day of the shooting, testified he was at the complex when he received a call that caused him concern. He and his co-worker walked to another area of the complex where they saw Tiffany, whom Calvin was familiar with because he had seen her at apartment 417, stumble and collapse into a grassy area. According to Calvin, when he approached Tiffany, she appeared to be in pain and raised her shirt to reveal a bullet hole in her stomach. Calvin asked her what happened, and she replied, "My uncle shot me." Calvin used his cell phone to call 911 because Tiffany was in distress. Calvin testified that he saw Harris come out of the apartment and walk up to Tiffany. According to Calvin, he did not know Harris's name or him personally and was only familiar with him from seeing him going in and out of apartment 417. Calvin told Harris to "leave her alone[]" and "I'm on the phone with the 911 people[,]" and

4

Harris went back inside the apartment and then attempted to leave the complex in a white car. Calvin testified that even though he believed Harris should not be leaving the scene, Calvin did not say anything to Harris when Harris left because Calvin was worried that Harris was armed. As Harris was leaving the scene, law enforcement arrived, Calvin told them to stop the car Harris was leaving in, and law enforcement was able to detain Harris at the scene. Law enforcement interviewed Calvin.

Warren Chilo, the other maintenance man working with Calvin that day, also testified that he saw Tiffany after she collapsed. Chilo testified that when Tiffany raised her shirt up it was obvious that the bullet had gone through her back and exited her stomach. According to Chilo, he did not know Tiffany's name at the time but knew that she lived in an apartment below Ricky and Calvin. Calvin stayed with Tiffany and tried to keep her alert until the ambulance arrived. Chilo testified that prior to the day of the shooting, he had never seen Harris, whom Chilo identified as the defendant at trial. Chilo recalled that Harris ran to Tiffany and tried to pick her up and take her back in the house in a rush, but Chilo told him not to touch her and that she had said her uncle had shot her. According to Chilo, Harris then ran back into the apartment. Chilo spoke with law enforcement at the scene and later he was interviewed at the police station. Recordings of the calls to 911 were admitted into evidence.

Another neighbor testified that she also lived in the same building as Tiffany and the neighbor's son heard a noise that day, looked out the window, and told her that Tiffany had collapsed downstairs. The neighbor, who had medical training, went to provide aid to Tiffany, and Tiffany repeatedly told the neighbor that she had been shot by her uncle. The neighbor testified that while Tiffany was in distress, Harris, who the neighbor determined was Tiffany's uncle, came out of the apartment and tried to leave the scene. The neighbor told Harris, "You shot her[,]" and that he could not leave, but he "grabbed his head . . . like 'No, no, no[,]'" and got in a white car and drove off. First responders arrived and the neighbor talked to one of the police officers that had responded to the scene and then later at the police department.

Detective Tomas Barboza with the Port Arthur Police Department testified that he went to the scene to investigate. Upon his arrival, officers were already on the scene, they had stopped a car near the building, and the victim had already been transferred to the hospital. As lead detective, Barboza determined that thirteen-year-old Tiffany was the victim, and that Harris had tried to leave the scene in his mother's vehicle. Detective Barboza obtained Harris's mother's consent to search the vehicle. Barboza also went into apartment 417 and recalled that it was "in shambles[,]" there was blood at the scene, and it appeared "there had been a struggle, a good fight in there, for sure."

6

According to Detective Barboza, at one point, Harris's mother mentioned a "Larry Small" as potentially being involved and she did not want to believe her son had shot Tiffany, but there was no indication from any of the witnesses that any other person was even there, and Barboza ultimately determined that the people involved in the struggle were together inside the apartment voluntarily and that the apartment had not been broken into. During the investigation, Harris admitted to firing a gun. Three days after the shooting, Detective Barboza visited Tiffany at the hospital. Tiffany was not able to verbally communicate with Barboza but through her typing on a digital device Barboza confirmed what other officers had told him about what had happened at the scene of the shooting, that Harris had shot her, and that she and Harris were the only ones in the apartment at the time of the shooting. Detective Barboza recalled that Tiffany received pressure from her family to not pursue charges against Harris, but that Barboza talked to her and told her to not let anyone change her mind. Detective Barboza recalled that Tiffany was interviewed at the Garth House on April 8, 2020, and that what Tiffany reported during that interview about the shooting was consistent with what she told Barboza at the hospital.

Officer Donald Jackson, a police officer with the Jefferson County Constable's Office responded to the scene and, in response to bystanders pointing to a white Kia Forte, Officer Jackson detained Harris, who was in the car. Officer Jackson testified that he spoke with Tiffany when she was at the scene, upset and in

7

pain, and she said that her uncle, whom she named as "Timothy," had shot her, and Officer Jackson asked what Timothy was wearing and she gave a description matching what Harris was wearing when he was detained. Footage from another officer's body camera of Officer Jackson interacting with and detaining Harris at the scene was admitted and published to the jury. When Officer Jackson went inside the apartment, he could see it looked like a struggle had occurred, and he found at least six bullet holes in the sheetrock walls of the living room. A Beretta automatic handgun was recovered from underneath a mattress in the apartment, and he collected eight fired shell casings and a bullet projectile from the apartment.

Hunter Jones, a firearms examiner at the Jefferson County crime lab, testified that a Beretta 9-millimeter Luger caliber firearm admitted as State's Exhibit No. 49, eight fired cartridge casings, and a projectile had been submitted to the crime lab for testing in this case. Jones determined that the eight spent cartridge casings were fired from State's Exhibit No. 49, the Beretta 9-millimeter, but his opinion was inconclusive as to whether the projectile that was submitted to the lab could have been fired from that firearm because "there was not enough information on the individual level to determine if it was identified as fired from that firearm or excluded as being from that firearm."

During the punishment phase of the trial, Investigator Matt Turner with the Jefferson County District Attorney's Office testified as to Harris's prior convictions

8

including a 2017 conviction for possession of a controlled substance and a 2019 conviction for driving while intoxicated, and judgments for those convictions were admitted into evidence.

Detective Terry Cater with the Port Arthur Police Department also testified at the punishment phase of the trial. He became involved when Tiffany reported at the Garth House interview related to the shooting that Harris had also sexually abused her from when she was age nine until she was thirteen. Based on Tiffany's outcry, Detective Cater began investigating Harris for the offense of continuous sexual abuse of a child. At a subsequent interview at the Garth House, Tiffany reported more details about the day of the shooting, that she had wanted Harris's sexual assaults to stop, and that it was Detective Cater's impression that Tiffany's desire to have the assaults stop was related to the shooting. According to the detective, a sexual assault nurse examiner examined Tiffany and Detective Cater prepared a probable cause affidavit that was submitted to the district attorney's office.

The Rule

In his first issue, Harris argues that "the trial court erred by allowing a witness to testify after the witness violated '[t]he Rule' by watching the trial proceedings on YouTube." The trial court invoked "the Rule" prior to trial as to the witnesses that were to testify at trial. According to Harris, Tiffany, the victim, was allowed to testify after she had watched the trial on YouTube the prior day, and the trial court

9

denied Harris's request for an evidentiary hearing on the matter outside the jury's presence. Harris contends that the trial court allowed Tiffany to testify without determining if her testimony would have been influenced by what she heard. On appeal, Harris acknowledges that an exception to The Rule exists for a victim unless the court determines that the victim's testimony would be materially affected by hearing other testimony at trial. Harris does not argue that the trial court abused its discretion in concluding Tiffany was exempt from The Rule. Instead, he argues that the trial court was required to conduct a hearing to determine if Tiffany's testimony would not be affected by hearing other testimony, which the trial court failed to do.

Rule 614 of the Texas Rules of Evidence, also known as "The Rule," provides that "[a]t a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony." *See* Tex. R. Evid. 614; *see also Guerra v. State*, 771 S.W.2d 453, 474-75 (Tex. Crim. App. 1988) (citing Tex. Code Crim. Proc. Ann. art. 36.05, which states in part, "in no case where the witnesses are under [The] [R]ule shall they be allowed to hear any testimony in the case[]"). The purpose of placing witnesses under Rule 614 is to prevent the testimony of one witness from influencing the testimony of another witness, consciously or not. *Russell v. State*, 155 S.W.3d 176, 179 (Tex. Crim. App. 2005). Rule 614 contains four exceptions to "The Rule" that allow certain witnesses to remain present in the courtroom while other witnesses testify, including when the witness is "the victim in a criminal case,

10

unless the court determines that the victim's testimony would be materially affected by hearing other testimony at the trial." Tex. R. Evid. 614(a)-(d). The party seeking to exempt a witness has the burden of showing that the claimed exception applies. *Russell*, 155 S.W.3d at 180; *see also Peters v. State*, 997 S.W.2d 377, 385 (Tex. App.—Beaumont 1999, no pet.) (applying prior rule) (citing *Moore v. State*, 882 S.W.2d 844, 848 (Tex. Crim. App. 1994)). Enforcement of Rule 614 and the application of its exceptions lies within the sound discretion of the trial court. *Caron v. State*, 162 S.W.3d 614, 618 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *see also In re D.F.L.*, No. 09-15-00310-CV, 2016 Tex. App. LEXIS 1167, at \*14 (Tex. App.—Beaumont Feb. 4, 2016, pet. denied) (mem. op.) ("A trial court's decision to allow a witness to remain in the courtroom after the Rule is invoked is reviewed for an abuse of discretion.").

On the second day of trial, the prosecutor brought this information to the trial court's attention before the jury was brought in:

> [Prosecutor]: The State's advised defense counsel that in my interviewing the complaining witness this morning, it turns out that she's watched some portions of the YouTube proceedings yesterday. So, I continue to interview her, and I will represent to the Court that portions that she did see - - she didn't watch the entire proceedings yesterday. The portion she saw, she indicates that she didn't hear or see anything different from what she already knew from personally being involved in the proceedings itself.
>
> I don't myself see it as a violation, just a little more of a technical violation. But I need to - - as an officer of the Court, I've got to bring it to the Court's attention, as well as the defense attorney. So I'd like to deal with that before we bring the jury in.

11

. . .

[Defense counsel]: . . . I don't know what the witness heard, and I have to . . . request that her testimony be excluded. I don't know what she watched or how long she watched it. I just know what she told [the prosecutor], and he told me - -

. . .

[Prosecutor]: She's present upstairs, Judge, if you want to - -

. . .

THE COURT: We're not going to do it right now. We've got to move forward. If you want a hearing on it, we'll have a hearing on it.

[Defense counsel]: I do, your Honor.

THE COURT: Bring the jury in. Thank you. We'll have a hearing on it, found out if there's harm.

After a witness testified but prior to Tiffany's testimony, the following exchange occurred outside the jury's presence:

[Prosecutor]: This is about whether or not - - this is about [Tiffany's] violation of the Rule.

. . .

THE COURT: . . . you're objecting.

[Defense counsel]: Yes, your Honor.

THE COURT: Why?

[Defense counsel]: I want to know what she heard, what witnesses she heard and what she remembers about what she's viewed.

THE COURT: Why?

[Defense counsel]: I want to know if it'll influence her testimony. . . .

THE COURT: What does the rule of sequestration say? Let me inform everybody, if you don't remember.

Rule 614, Excluding Witnesses: "At a party's request, the Court must order witnesses excluded, so that they cannot hear other

12

witnesses' testimony, or the Court may do so on its own. But this rule does not authorize excluding, [under subsection] d, the victim in a criminal case unless the Court determines that the victim's testimony would be materially affected by hearing other testimony of the trial."

I have not made that finding. It wasn't asked of me. Unless that happens, she's not required to be excluded. In fact, it express[]ly states, "This rule does not authorize at all excluding the victim."

What are y'all asking to do? You?

[Defense counsel]: I'm asking . . . the Court to determine if the other witnesses' testimony she's heard will affect her testimony.

THE COURT: You can do that on cross-examination, I think. I mean, she's not excluded under the Rule.

Defense counsel then argued that "a hearing should be conducted before [Tiffany] testifies in front of the jury to see . . . if there is harm." The trial court responded, "What matter would it make? She's excluded under the Rule." The trial court then explained to defense counsel that on cross-examination defense counsel could "ferret out" whether Tiffany's testimony was influenced by hearing the other testimony. The trial court stated that this was the proper procedure "unless y'all can tell me something otherwise or show me a case law that shows that. I can't find one." Harris objected to the trial court's denial of Harris's request to hold a hearing to determine if Tiffany's testimony had been impacted by the other testimony she had heard, and Harris asked for a mistrial when the trial court denied his request for a hearing.

Tiffany testified as to her recollection of the events on the day of the shooting. On cross-examination, Tiffany testified that prior to her testimony she had watched portions of the prior day's trial on YouTube, but that none of what she heard

impacted her testimony. After this testimony by Tiffany, the following exchange

occurred at the bench and out of the hearing of the jury:

> THE COURT: I feel compelled to give an instruction to the jury about . . . the point that was made, but I don't want them thinking maybe she's violating the Rule. The Rule, we'll talk about what the exceptions of the Rule are. . . .
>
> [Prosecutor]: I agree, Judge.
>
> THE COURT: . . . I'm considering doing that. Any objection?
>
> [Prosecutor]: None.
>
> THE COURT: It's a rule of law.
>
> [Prosecutor]: Right . . . as long as it's clear that she's an exception and didn't violate it; yes, sir.
>
> THE COURT: That's all right.
>
> [Defense counsel]: Yes, sir.

When the jury was brought back into the courtroom, the trial court stated the

following to the jury:

> Ladies and gentlemen, I'm going to give you an instruction of law based upon the last testimony. You've heard some testimony relating to questions asked by the defense if she had been watching anything. And she testified that she saw some YouTube presentation of this case.
>
> As you know, witnesses who were placed under the rule of sequestration - - that means the witnesses must stay outside and not discuss things with other witnesses so that their testimony might not be influenced in some way.
>
> Rule 614, the way we wrote the Rules of Evidence when I was on the committee, provides that the Court must order witnesses to be excluded from being present and not hearing other witnesses'[]

14

testimony at any party's request, or the Court may also do so on its own. And that was done to the witnesses.

This rule of sequestration does not apply and excludes the victim of a criminal case unless the Court determines the victim's testimony would be materially affected by hearing other testimony. I did not make that finding. So, she is excluded from that Rule under this case and was not violating that Rule. Okay. Anything else?

[Prosecutor]: Not on that point, Judge. At this stage the State rests.

We are not aware of any authority requiring a trial court to have a hearing when determining whether the victim's testimony would be materially affected by hearing other testimony at the trial for purposes of determining whether the victim is or is not exempt under subsection (d) of Rule 614, and Harris has not cited to any such authority to the trial court or on appeal. Harris did not object to the trial court's instruction to the jury explaining that Tiffany was exempt from the Rule. Further, even if Harris had preserved error as to his appellate argument, Tiffany testified on cross-examination that prior to her testimony she had watched portions of the prior day's trial on YouTube but that none of what she heard impacted her testimony. Accordingly, the trial court did not abuse its discretion. We overrule issue one.

Ineffective Assistance of Counsel Claim

In his second issue, Harris argues defense counsel provided ineffective assistance by failing to object to extraneous offense evidence presented by the State during the punishment stage. Specifically, Harris contends that his trial counsel failed to object when a detective testified during punishment that Harris had been

15

accused of continuous sexual abuse of a child against Tiffany. According to Harris, if defense counsel would have objected, the trial court "could have conducted a balancing test as to whether the admissibility of the evidence against the prejudicial impact[] [of the evidence] outweighs its probative value."

A defendant has a Sixth Amendment right to the effective assistance of counsel at trial. U.S. Const. amend. VI; *see Strickland v. Washington*, 466 U.S. 668, 684-85 (1984). To establish that he received ineffective assistance of counsel, Harris must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *See Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001) (citing *Strickland*, 466 U.S. at 687). The party alleging ineffective assistance has the burden to develop fact and details necessary to support the claim. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). A party asserting an ineffective-assistance claim must overcome the "strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *See Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) (citing *Strickland*, 466 U.S. at 689). To defeat this presumption, any allegation of ineffectiveness must be firmly grounded in the record so that the record affirmatively shows the alleged ineffectiveness. *Prine v. State*, 537 S.W.3d 113, 117 (Tex. Crim. App. 2017). Generally, counsel should be given an opportunity

to explain his actions before being found ineffective. *Id.* In most cases, direct appeal is an inadequate vehicle for raising an ineffective-assistance claim because the record is undeveloped and cannot adequately reflect the motives behind trial counsel's actions. *Rylander v. State*, 101 S.W.3d 107, 110-11 (Tex. Crim. App. 2003). In the face of a silent record, we cannot know trial counsel's strategy, so we will not find deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (internal quotation omitted). An appellant's failure to make either of the required showings of deficient performance or prejudice defeats the claim of ineffective assistance. *Rylander*, 101 S.W.3d at 110; *see also Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009) ("An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong.").

The right to effective assistance of counsel ensures the right to "reasonably effective assistance[,]" and it does not require that counsel must be perfect or that the representation must be errorless. *See Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984). The appropriate context is the totality of the representation; counsel should not be judged on isolated portions of the representation. *See Thompson*, 9 S.W.3d at 813; *Solis v. State*, 792 S.W.2d 95, 98 (Tex. Crim. App. 1990).

In this matter, the record is silent on trial counsel's reasons for not objecting to Detective Cater's testimony regarding the alleged sexual assault of Tiffany. Harris did not file a motion for new trial alleging ineffective assistance of counsel or otherwise develop a record of trial counsel's reasons for his actions. Without testimony from trial counsel, the court must presume counsel had a plausible reason for his actions. *See Broadus v. State*, No. 09-19-00438-CR, 2021 Tex. App. LEXIS 2794, at *18 (Tex. App.—Beaumont Apr. 14, 2021, pet. ref'd) (mem. op., not designated for publication).

The failure to object to extraneous offense evidence may be a sound trial strategy. *See Williams v. State*, 417 S.W.3d 162, 183-84 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (failure to object to extraneous offense evidence may constitute "sound and plausible trial strategy[]"); *Heiman v. State*, 923 S.W.2d 622, 626-27 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) (failure to object to extraneous offense testimony, in absence of record showing counsel's reasons for not doing so, was not ineffective assistance because not objecting could have been plausible trial strategy). In the absence of a record explaining why counsel did not object, we decline to conclude that counsel's conduct was so outrageous that no competent attorney would have engaged in it or that Harris has rebutted the presumption that counsel's actions were part of some sound trial strategy. *See Goodspeed*, 187 S.W.3d at 392.

Also, we note that defense counsel's failure to object to admissible evidence does not constitute ineffective assistance. *See Myers v. State*, Nos. 09-14-00365-CR & 09-14-00366-CR, 2015 Tex. App. LEXIS 7804, at *16 (Tex. App.—Beaumont July 29, 2015, no pet.) (mem. op., not designated for publication) (citing *McFarland v. State*, 845 S.W.2d 824, 846 (Tex. Crim. App. 1992), *overruled on other grounds by Bingham v. State*, 915 S.W.2d 9 (Tex. Crim. App. 1994)); *see also Ex parte Jimenez*, 364 S.W.3d 866, 887 (Tex. Crim. App. 2012) ("The failure to object to . . . admissible testimony . . . is not ineffective assistance.").

Article 37.07 of the Code of Criminal Procedure provides that during the punishment phase of trial, evidence as to any matter deemed relevant to sentencing may be admitted, including evidence of an extraneous offense shown beyond a reasonable doubt to have been committed by the defendant. Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1). Evidence is relevant to sentencing if it is "helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case." *Rodriguez v. State*, 203 S.W.3d 837, 842 (Tex. Crim. App. 2006). This includes but is not limited to evidence regarding an extraneous crime or bad act for which the defendant could be held criminally responsible, regardless of whether the defendant has previously been charged with or finally convicted of the crime or act. *Id.* at 841-42. Prior crimes or bad acts are introduced to provide additional

19

information that the jury may consider in determining what sentence the defendant should receive. *Fields v. State*, 1 S.W.3d 687, 688 (Tex. Crim. App. 1999).

The second part of the *Strickland* test also requires an appellant to show that there is a reasonable probability that the outcome of his case would have been different but for counsel's errors. *Strickland*, 466 U.S. at 694. Having concluded that Harris failed to satisfy the requirements of the first *Strickland* prong, we need not address the second prong. *See Williams*, 301 S.W.3d at 687. We overrule Harris's second issue.

Due Process Claim

In his third issue, Harris argues he was denied due process under article 39.14(h) of the Texas Code of Criminal Procedure when the State failed to timely provide discovery related to three other pending indictments against another family member for alleged sexual assault of the complaining witness. *See* Tex. Code Crim. Proc. Ann. art. 39.14(h) ("Notwithstanding any other provision of this article, the state shall disclose to the defendant any exculpatory, impeachment, or mitigating document, item, or information in the possession, custody, or control of the state that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged."). Harris argues that the discovery related to the other indictments was not made available to the defense counsel prior to trial. Harris contends on appeal that the testimony of the complaining witness "was allowed by

20

the trial court as an extraneous offense during the punishment stage of the trial and defense's cross examination was insufficient due to the lack of this discovery." But the record shows the complaining witness did not testify during the punishment phase of the trial. Harris does not cite to any part of the appellate record in support of this issue. *See* Tex. R. App. P. 38.1(i) (appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record[]").

To preserve an issue for appellate review, the defendant must make a timely request, objection, or motion stating specific grounds for the ruling he desires the trial judge to make and obtain a ruling on the objection. Tex. R. App. P. 33.1(a)(1); *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002) (citing *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995)). No objection was made at trial. Additionally, Harris's appellate brief states that "[u]pon learning of these documents, Defense counsel filed a Motion for New Trial with the [trial] Court[,]" but the appellate record does not include a motion for new trial and the docketing statement provides no indication that a motion for new trial was filed in the trial court. We overrule issue three.

We affirm the trial court's judgment.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on May 22, 2025
Opinion Delivered July 23, 2025
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.