**Opinion issued August 19, 2025**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-23-00433-CR**

**NO. 01-23-00434-CR**

_____

**RODERICK DEMONTE RICHARDS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 122nd District Court**
**Galveston County, Texas**
**Trial Court Case Nos. 21CR2083, 23CR0278**

---

## MEMORANDUM OPINION

A jury convicted Roderick Demonte Richards of the third-degree felony offense of assault on a family or household member by impeding breath or circulation and the second-degree felony offense of aggravated kidnapping with

intent to commit bodily injury.[1] After Richards pleaded true to the allegations in an enhancement paragraph, the jury assessed his punishment at 17.5 years' confinement for the assault offense and 10 years' confinement for the kidnapping offense.

Richards raises two issues on appeal: (1) the trial court erred by overruling his objection to jury argument that attacked the character of defense counsel; and (2) this Court should reform the judgment for the aggravated kidnapping offense to accurately reflect that the offense did not involve sexual abuse. We affirm.

## Background

Richards and the complainant Wendy Taylor knew each other for several years before their relationship turned romantic in 2020. They both had children from other relationships, including Taylor's two adult children, but their youngest daughters were the same age and got along well. At some point during the relationship, Taylor and her daughter stayed at Richards' house in Texas City. They did not live with Richards for the entire relationship.

Taylor ended the relationship with Richards in March 2021. She had left several personal items at his house, and she stopped by one Friday evening in April

---

[1] *See* TEX. PENAL CODE §§ 22.01(a)(1), (b)(2)(B) (providing that assault on family or household member by impeding normal breathing or circulation is third-degree felony), 20.04(a)(4), (d) (providing that aggravated kidnapping with intent to inflict bodily injury is second-degree felony if defendant proves he voluntarily released victim in safe place). The assault offense was tried in trial court cause number 21CR2083 and resulted in appellate cause number 01-23-00433-CR. The kidnapping offense was tried in trial court cause number 23CR0278 and resulted in appellate cause number 01-23-00434-CR.

to pick up these items. When she arrived, Taylor decided to leave her cell phone in her car while she went inside. She did this for two reasons: (1) she did not intend to be at Richards' house for long; and (2) she believed that her phone potentially could be the source of an argument.

Taylor described Richards' demeanor as "normal" when she arrived. They spoke for a moment in the living room, and then she used the restroom. When she returned from the restroom, Richards' demeanor had changed. Richards had gone out to Taylor's car, looked through her cell phone, and discovered that Taylor "was talking with somebody else": another man who Richards knew.[2] This discovery made Richards angry, and he attacked Taylor by shoving, hitting, and choking her.

Richards used his fists to hit Taylor in her head, ribs, arms, and stomach. After "hours" of this, Taylor tried to escape by running into the backyard and screaming for help. Richards caught up with her and wrestled her to the ground. Richards continued punching and hitting Taylor. He "smashed" his son's bicycle down on her head, and he also "pulled down branches from a bush, and it ripped out some of [Taylor's] hair." Taylor was lying in an ant bed, and she could feel ants biting her from her feet "all the way up to [her] shoulders." Richards himself also "tried to bite the top of [Taylor's] ear off" and bit behind her ears and on her back.

---

[2]  Taylor denied that she was dating this other man or that he was a "new significant other." She characterized their relationship as "[a] friend with benefits" situation, and they "had been back and forth with each other."

Taylor was terrified, and at one point she "told [Richards] to kill [her] and not take [her] back in the house." Richards told Taylor that he "was going to beat [her] until the white meat came out of [her] head." He also threatened her with his pit bull, telling the dog to "get her, boss."

Taylor could not get up. She tried, "but it was too hard to lift anything." When Richards choked her, she was not able to breathe, and she tried to pull his fingers off her neck and do "whatever [she] could try to do to make it stop." While being choked, Taylor had difficulty hearing, and she also urinated on herself at least three times. When Richards stopped choking her, "he grabbed both of [her] breasts and squeezed and then just tried to pull." He also threw Taylor's cell phone at her, and it hit the corner of her eye.

The assault began on Friday night and went on until around 7:00 in the morning on Saturday. Taylor did not feel like she was free to leave Richards' house before that point: she "tried, but he wasn't going to let [her] leave." She felt like Richards would kill her if she kept trying to leave. Finally, Taylor agreed to have sex with Richards, knowing that he would fall asleep afterwards and she might have a chance to escape.

After Richards fell asleep, Taylor "[s]lowly made [her] way to the bathroom and soaked in hot water" because her entire body hurt. She then laid down in the living room.

While Richards was asleep and Taylor was laying down, Taylor's young daughter called her because she needed a ride. Taylor tried to leave the house under her own power, but she could not. Richards had to physically help her to her car. Taylor was able to drive herself home, but "everything hurt, and it was difficult." Taylor knew she could not let her daughter see her injured, so she asked her daughter's father to pick her up. Taylor's injuries were severe enough that she did not see her daughter for two months after the assault.

Taylor did not immediately seek medical attention after the assault. Instead, when she arrived home, she took a shower and then "laid in the bed and just slept" because she was exhausted. She did not immediately contact law enforcement because she was terrified, she "just wanted to sleep," and she was afraid that Richards would retaliate against her. She did not feel safe in her own home, so she stayed with a friend for several weeks.

Taylor sought medical attention on the Monday following the assault because the bite marks that she had sustained became infected. The medical exam revealed that in addition to serious bruising and bite marks, she also had a broken eye socket, two skull fractures, and broken ribs. She then drove to the Texas City Police Department and reported the assault in person because she "wanted to make sure that something was filed so that he would have to stay away from [her] and just because [she] was scared."

Officer Veronica De La Garza received the dispatch and spoke with Taylor at the police department. As soon as De La Garza saw Taylor, she could see "the bruising all over her face, the bright purple around her neck," a laceration that had started to scab, swollen cheeks, and dark purple bruising around Taylor's eyes. In a private room, Taylor took off her sweatshirt and De La Garza saw bruising "from her arm all the way up," bite marks on her back, bruises under her breast and on her stomach, and ant bites on her back and feet. De La Garza took numerous pictures documenting Taylor's injuries, and the trial court admitted these pictures into evidence. Taylor provided De La Garza with her medical records from the hospital and told her that Richards committed the assault. De La Garza unsuccessfully attempted to contact Richards by phone. She also reported the offense to the Galveston County District Attorney's Office, which accepted charges. De La Garza did not go to Richards' house to view the scene or attempt to collect any DNA or fingerprint evidence from Taylor.[3]

A grand jury initially indicted Richards for the offense of assault on a family or household member by impeding breath or circulation. More than a year later, a

---

[3]    De La Garza justified this decision by stating: "Well, [Taylor] had already identified her offender. I had all the information I needed. I did not need to take fingerprints or collect DNA if I already knew—or she already told me who did it to her." She did not go to Richards' house because "[t]o me there was nothing to gather there." She further stated, "I believe that the evidence all over her body was enough of an investigation to move forward."

different grand jury indicted Richards for the offense of aggravated kidnapping. Relevant to this appeal, the aggravated kidnapping indictment alleged that Richards acted with "the intent to inflict bodily injury on or terrorize Wendy Taylor." The indictment did not allege that Richards acted with the intent to "violate or abuse [Taylor] sexually."[4] *See* TEX. PENAL CODE § 20.04(a)(4), (5) (providing that person commits offense of aggravated kidnapping if he intentionally or knowingly abducts another person with intent to "inflict bodily injury on him or violate or abuse him sexually" or with intent to "terrorize him or a third person").

Both charged offenses were tried in the same trial. Three witnesses testified: Taylor, De La Garza, and Amanda Amore, a forensic nurse who primarily testified about injuries that could occur from strangulation. Amore did not examine or meet Taylor.

On cross-examination of Taylor, defense counsel focused on her actions after the assault: why she did not immediately escape the house after Richards fell asleep, why she did not call 911, why she did not immediately report the assault to law enforcement even though she had to drive by the police department on her way home, why she did not immediately seek medical attention, and why she did not

---

[4]   Similarly, the jury charge for the aggravated kidnapping offense informed the jury that "[o]ur law provides that a person commits the offense of Aggravated Kidnapping if the person intentionally or knowingly abducts another person with intent to inflict bodily injury or terrorize the victim." The charge did not include any language relating to the intent to "violate or abuse [the victim] sexually."

7

want the hospital to notify law enforcement of the assault. Defense counsel also asked about Taylor's relationship with another man around the same time as the assault. He further asked about statements in Taylor's medical records—such as a statement that she had already reported the offense to law enforcement and a statement that she was assaulted by her "significant other"—that were inconsistent with Taylor's trial testimony. Defense counsel's cross-examination of De La Garza focused on perceived shortcomings in her investigation, most notably her failure to visit Richards' house and information that De La Garza did not include in her offense report.

Defense counsel made these same points during closing argument. Counsel assailed Taylor's decision not to immediately seek medical care, stating:

> If you're really, really hurt, you seek help. You don't want Motrin and you don't want Ibuprofen and you don't want your bed. If you are really, really hurt, you really want help. And you don't want it in three days. You need it then if you are really, really hurt.

Counsel also argued that another person—perhaps Taylor's "boyfriend out there who is texting her"—assaulted Taylor.

In rebuttal, the State challenged defense counsel's assertion that Taylor was not really hurt, arguing:

> When you get beat for 12 hours and you get strangled for 12 hours over and over to the point she has urinated on herself at least three times. One of those statements he [defense counsel] says is, "If you're really, really hurt," how that he can look at you with a straight face and say—

At that point, defense counsel objected, stating that the prosecutor was "attacking the Defendant over [counsel's] shoulder." The trial court overruled the objection. The State continued its argument, and defense counsel did not raise this same objection to any other statements.

The jury found Richards guilty of both assault by impeding breath or circulation and aggravated kidnapping, and it assessed Richards' punishment at confinement for 17.5 years and 10 years, respectively. The trial court signed judgments of conviction for both offenses. The judgment for the aggravated kidnapping offense named the offense as "Agg Kidnapping BI/Sexual Abuse Safe Release."

This appeal followed.

## Propriety of Jury Argument

In his first issue, Richards argues that the trial court erred by overruling his objection to the State's jury argument.

### A. Standard of Review and Governing Law

Closing argument assists the jury in properly analyzing the evidence presented at trial so it may "arrive at a just and reasonable conclusion based on the evidence alone, and not on any fact not admitted in evidence." *Milton v. State*, 572 S.W.3d 234, 239 (Tex. Crim. App. 2019) (quotations omitted). Proper jury argument typically falls within one of four areas: (1) summation of the evidence;

(2) reasonable deduction from the evidence; (3) answer to an argument of opposing counsel; and (4) plea for law enforcement. *Id.* The State has wide latitude in its jury argument, and it may "draw all reasonable, fair, and legitimate inferences from the evidence." *Williams v. State*, 417 S.W.3d 162, 174 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). Generally, we leave the bounds of proper closing argument to the sound discretion of the trial court, and we review the propriety of jury argument for an abuse of discretion. *Milton*, 572 S.W.3d at 240, 241.

A jury argument that "strikes at a defendant over the shoulders of defense counsel is improper." *Davis v. State*, 329 S.W.3d 798, 821 (Tex. Crim. App. 2010); *Williams*, 417 S.W.3d at 174 ("The State may not, however, use closing argument to 'strike' at a defendant over the shoulders of his counsel or accuse counsel of bad faith."). A prosecutor risks improperly striking at a defendant over the shoulders of counsel when the prosecutor makes the argument "in terms of defense counsel personally" or when the argument "explicitly impugns defense counsel's character." *Williams*, 417 S.W.3d at 174; *see Whitney v. State*, 396 S.W.3d 696, 704 (Tex. App.—Fort Worth 2013, pet. ref'd) (stating that prosecutor impermissibly strikes at defendant over counsel's shoulders when, for example, prosecutor argues that defense counsel "manufactured evidence, suborned perjury, accepted stolen money, or represented criminals"). These kinds of arguments "are improper because they

unfairly inflame the jury against the accused." *Williams*, 417 S.W.3d at 174 (quoting *Wilson v. State*, 7 S.W.3d 136, 147 (Tex. Crim. App. 1999)).

A prosecutor may, on the other hand, attack defense counsel's argument. *Id.* For example, the Court of Criminal Appeals has held that a prosecutor's statement that "when you have neither [the facts nor the law] on your side, you argue something ridiculous" was not an improper attack directed at defense counsel but was instead directed at counsel's argument and was therefore proper. *See Coble v. State*, 871 S.W.2d 192, 203, 205 (Tex. Crim. App. 1993). Similarly, the Court of Criminal Appeals has held that a prosecutor's statement that defense counsel was "going to come here, and he's going to put himself before twelve citizens of this community and he's going to argue that hogwash that you've heard" was "plainly directed at defense counsel's theories and arguments in the case" and did not "warrant a reversal for attacking the personal morals and integrity of defense counsel." *Garcia v. State*, 126 S.W.3d 921, 925 (Tex. Crim. App. 2004).

When a trial court erroneously overrules an objection to improper jury argument that strikes at a defendant over the shoulder of counsel, we analyze harm under the standard for non-constitutional error found in Rule of Appellate Procedure 44.2(b). *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g). Under this standard, we must disregard "[a]ny other error, defect, irregularity, or variance that does not affect substantial rights." TEX. R. APP. P. 44.2(b). We

11

generally look to three factors in assessing harm: (1) severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); (2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Mosley*, 983 S.W.2d at 259.

## B.    Analysis

During closing argument, defense counsel faulted Officer De La Garza for not conducting a thorough investigation and instead relying solely on Taylor's report of the assault. Counsel argued:

> If the events happened as Ms. Taylor said they happened, that area in the house would be replete with evidence. There would be blood if it happened the way she said it happened. There should be evidence of a struggle if it happened the way she said it happened. There should be all types and manner of things that the police would have access to even days later had they looked.

However, Officer De La Garza did not visit Richards' house, and therefore no evidence existed to "confirm or refute" Taylor's account of events.

Defense counsel argued that an unknown person had assaulted Taylor. As support for this theory, counsel pointed to a statement in Taylor's medical records that she refused a tetanus shot at the hospital because she did not "want to be poked" and she had "had enough to go through the last few days." Counsel argued that Taylor was around Richards "Friday to Saturday, not before and not after. Definitely

12

not the last few days before she goes to the hospital on Monday night at 11:00 o'clock."

Counsel also highlighted two inconsistencies between Taylor's medical records and Taylor's trial testimony. In the first inconsistency, the medical records stated that Taylor had reported the incident to law enforcement but refused medical care, while Taylor testified that she went to the hospital before making a police report. Counsel argued that Taylor made misrepresentations to hospital personnel because she "is in control of how this goes," and she wanted police officers to be the ones taking pictures to document her injuries rather than medical personnel "at the scene to help explain what's going on."

In the second inconsistency, Taylor told medical personnel that she was assaulted by her "significant other," but at trial, Taylor referred to Richards as her "ex-boyfriend." With respect to this inconsistency, counsel did not believe that Taylor was misrepresenting anything when she spoke to hospital personnel:

> I think that's an unguarded moment of an alternate theory of the crime. Someone else did these things. We know there's a delay. We know that she says in the medical records it happened over the last couple of days, not a couple of days ago. We know that she has another boyfriend out there who is texting her.

Counsel later argued that Taylor had bruises in "various stages of healing," but Richards was "only around her for a short period of time" and "if she has bruises in various stages of recovery, he cannot be the cause of those bruises."

Defense counsel also focused on Taylor's actions after the assault, specifically, her failure to leave Richards' house right after the assault, her decision not to immediately report the offense to law enforcement, and her decision not to immediately seek medical care. Counsel argued:

> Ms. Taylor had a lot of excuses for everything she didn't do. She had a lot of excuses for everything that I think common sense tells us we would do.
>
> If you're—if you have gone through that horrendous assault that she outlined and you had done whatever it took so that the alleged perpetrator is asleep, would you make your escape or would you take a soak? If you are in your car, the door is locked, you have the keys, you've got the cell phone, would you call 911 or would you call your daughter's father and say, "Can you pick her up? You pick her up. I'm going home. I'm tired."
>
> If you're really, really hurt, you seek help. You don't want Motrin and you don't want Ibuprofen and you don't want your bed. If you are really, really hurt, you really want help. And you don't want it in three days. You need it then if you are really, really hurt.

Counsel argued that Taylor's actions and the various inconsistencies between the medical records and Taylor's trial testimony added up to reasonable doubt that Richards assaulted and kidnapped Taylor.

The prosecutor began rebuttal by agreeing that "[t]here's no manual for how someone responds to trauma" and pointing out that Taylor explained her rationale for why she did not immediately seek medical attention. The following exchange then occurred:

| The State: | When you get beat for 12 hours and you get strangled for 12 hours over and over to the point she |

14

|  |  |
|---|---|
|  | has urinated on herself at least three times. One of those statements [defense counsel] says is, "If you're really, really hurt," how that he can look at you with a straight face and say— |
| Defense counsel: | Objection, Your Honor. She's attacking the Defendant over my shoulder. |
| The Court: | Overruled. |
| The State: | How can you say, "If you're really, really hurt"? Ladies and gentlemen, look at these photographs. If you are really, really hurt, she is black and blue all over her body. He tried to pull her breast off her chest. You want to say if you are really, really hurt. That's offensive.<br><br>Look at the pictures when you go back there, bruises all over the place. Even in this picture, you can see a deep dark purple bruise across her back. She told you guys—the medical records will tell you that she's severely injured. She's got a fractured orbital bone. She's got all of these bruising and issues. I don't think there's a question in the charge of whether or not she had bodily injury, right? |

The State argued that Richards should not escape responsibility because Taylor "didn't do a checklist of everything we think she should do perfectly." The State also argued that there "was no question about who did this," noting that Taylor and Richards had been in a dating relationship, and she knew him well.

On appeal, Richards argues that the trial court erred by overruling his objection to the prosecutor's statement about defense counsel challenging whether Taylor was really injured "with a straight face" because this argument improperly

attacked defense counsel's character and accused him of insincerity.[5] Richards argues that his trial counsel made a legitimate argument questioning Taylor's actions, and this "cannot serve as a basis for permitting prosecutorial comments that cast aspersion on defense counsel's veracity." In arguing that the trial court did not abuse its discretion by overruling the objection, the State argues that the prosecutor's statement properly responded to an argument made by defense counsel and did not personally attack defense counsel or his character. We agree with the State.

Defense counsel's theory of the case was that Taylor only spent a short amount of time in Richards' presence on Friday evening into Saturday, and the reason why she did not immediately seek medical attention or report an assault to law enforcement (despite driving past the Texas City Police Department on her way from Richards' house to her house) was because he did not assault her. Instead, an unknown person—perhaps Taylor's new boyfriend—assaulted her. He argued that if Taylor was "really, really hurt," she would have sought medical care immediately rather than wait three days before going to the hospital.

---

[5] To the extent Richards argues on appeal that the prosecutor's statement calling defense counsel's argument "offensive" was also improper jury argument, we note that Richards did not object to this statement in the trial court and therefore has not preserved any complaint about this statement for appellate review. *See Hernandez v. State*, 538 S.W.3d 619, 622 (Tex. Crim. App. 2018) ("The right to a trial untainted by improper jury argument is forfeitable."); *see also Temple v. State*, 342 S.W.3d 572, 603 (Tex. App.—Houston [14th Dist.] 2010) ("A defendant must object each time an improper argument is made, or he waives his complaint, regardless of how egregious the argument."), *aff'd on other grounds*, 390 S.W.3d 341 (Tex. Crim. App. 2013).

The State focused on the severity and number of Taylor's injuries and rhetorically asked how defense counsel could question whether Taylor was "really, really hurt" with a "straight face." In making this argument, the State repeated a phrase—"really, really hurt"—that defense counsel had used multiple times to cast doubt on Taylor's version of events. We agree that the State was attacking defense counsel's argument, rather than defense counsel himself or his character. *See Garcia*, 126 S.W.3d at 925 (concluding that prosecutor's statement that defense counsel was "going to argue that hogwash that you've heard" was "plainly directed at defense counsel's theories and arguments in the case" and was therefore proper); *Coble*, 871 S.W.2d at 205 (reaching similar conclusion concerning prosecutor's statement that "when you have neither [the facts nor the law] on your side, you argue something ridiculous"). Attacking defense counsel's argument falls within the bounds of permissible jury argument for a prosecutor. *Williams*, 417 S.W.3d at 174; *Acosta v. State*, 411 S.W.3d 76, 93 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("The State may attack the defense counsel's argument; that is different from attacking the defense counsel personally."). We conclude that the trial court did not err by overruling defense counsel's objection to the prosecutor's argument.

We overrule Richards' first issue.

## Reformation of Aggravated Kidnapping Judgment

In his second issue, Richards argues that this Court should reform the designation of the offense in the aggravated kidnapping judgment because it is inaccurate.

An appellate court has authority to reform a judgment to make the record speak the truth when the matter has been called to its attention by any source. *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *Van Flowers v. State*, 629 S.W.3d 707, 710–11 (Tex. App.—Houston [1st Dist.] 2021, no pet.). The Texas Rules of Appellate Procedure also provide "direct authority" for an appellate court to modify a trial court's judgment. *Rhoten v. State*, 299 S.W.3d 349, 356 (Tex. App.—Texarkana 2009, no pet.) (modifying judgment to reflect that defendant pleaded "not guilty" to charged offense); TEX. R. APP. P. 43.2(b) (providing that appellate court may "modify the trial court's judgment and affirm it as modified").

A trial court's judgment shall reflect "[t]he offense or offenses for which the defendant was convicted." TEX. CODE CRIM. PROC. art. 42.01, § 1(13). In describing the offense, the trial court is not required "to include only the title of the offense identified in the Penal Code." *Miles v. State*, 468 S.W.3d 719, 738 (Tex. App.—Houston [14th Dist.] 2015), *aff'd on other grounds*, 506 S.W.3d 485 (Tex. Crim. App. 2016). Instead, the judgment may include additional descriptive language so long as that language accurately describes the offense. *Id.* at 737–38.

Penal Code section 20.04 provides several different ways in which a defendant can commit the offense of aggravated kidnapping, including if he "intentionally or knowingly abducts another person with the intent to . . . inflict bodily injury on him or violate or abuse him sexually" or "terrorize him or a third person." TEX. PENAL CODE § 20.04(a)(4), (5). The indictment for the aggravated kidnapping offense alleged that Richards intended to inflict bodily injury upon Taylor or terrorize her, not that he intended to violate or abuse her sexually:

> THE GRAND JURORS . . . present that RODERICK DEMONTE RICHARDS, on or about the 9th day of April, 2021 and anterior to the presentment of this indictment in the County of Galveston and State of Texas, did then and there, with the intent to inflict bodily injury on or terrorize Wendy Taylor, intentionally or knowingly abduct Wendy Taylor, hereafter styled the complainant, by restricting the movements of the complainant without her consent so as to interfere substantially with her liberty, by confining her, with the intent to prevent her liberation, by using or threatening to use deadly force, namely striking/hitting/punching the complainant with his hands, or threatening to kill or inflict serious bodily injury on the Complainant.

The jury charge instructed the jury that "a person commits the offense of Aggravated Kidnapping if the person intentionally or knowingly abducts another person with intent to inflict bodily injury or terrorize the victim." The jury found Richards "guilty of the offense of Aggravated Kidnapping as alleged in the indictment."

The aggravated kidnapping judgment listed the "Offense for which Defendant Convicted" as follows: "Agg Kidnapping BI/Sexual Abuse Safe Release." The parties agreed that although this case involved bodily injury, it did not involve sexual

19

abuse, and therefore including "sexual abuse" in the description of the offense did not accurately describe the offense. While this appeal was pending, the parties discussed this issue with the trial court at an abatement hearing. The trial court believed that it did not have the authority to change the description of the offense.

After Richards filed his appellate brief and raised this issue, the trial court signed a judgment nunc pro tunc. The nunc pro tunc judgment stated that the original aggravated kidnapping judgment of conviction contained an error: "The wording of the offense needed to be changed." The nunc pro tunc judgment listed the "Offense for which Defendant Convicted" as "Agg Kidnapping BI/Safe Release."

A nunc pro tunc judgment provides a method for trial courts "to correct the record when there is a discrepancy between the judgment as pronounced in court and the judgment reflected in the record." *Blanton v. State*, 369 S.W.3d 894, 897–98 (Tex. Crim. App. 2012). The corrections must reflect the judgment that was actually rendered but for some reason was not properly entered into the record at the time of judgment. *Id.* at 898. These corrections are limited to clerical errors rather than errors involving judicial reasoning. *Id.*

By signing the judgment nunc pro tunc, the trial court granted Richards the relief that he seeks in his second issue. This issue is therefore moot. *See Truong v. State*, 580 S.W.3d 203, 207 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("The mootness doctrine limits courts to deciding cases in which an actual controversy

20

exists between the parties."); *Ex parte Flores*, 130 S.W.3d 100, 105 (Tex. App.—El Paso 2003, pet. ref'd) ("When there has ceased to be a controversy between the litigating parties which is due to events occurring after judgment has been rendered by the trial court, the decision of an appellate court would be a mere academic exercise and the court may not decide the appeal.").

We overrule Richards' second issue.

## Conclusion

We affirm the judgments of the trial court.


David Gunn
Justice

Panel consists of Justices Guerra, Gunn, and Dokupil.

Do not publish. TEX. R. APP. P. 47.2(b).