**Opinion issued November 25, 2025**



In The

# Court of Appeals

For The

# First District of Texas

_____

NO. 01-23-00833-CR

NO. 01-23-00834-CR

_____

**JOEL MOORE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 482nd District Court**
**Harris County, Texas**
**Trial Court Case Nos. 1700529 & 1700530**

## MEMORANDUM OPINION

A jury found appellant Joel Moore guilty of aggravated robbery with a deadly weapon and evading arrest with a motor vehicle and assessed his punishment at seventy-five years' confinement and a $10,000 fine for the aggravated robbery

offense (Cause No. 1700529) and ten years' confinement and a $10,000 fine for the evading arrest offense (Cause No. 1700530). In two issues, appellant contends that the trial court erred by (1) allowing victim impact testimony relating to an extraneous offense of murder from the victim's sister during the punishment phase of trial and (2) denying appellant's motion for mistrial. We affirm.

## Background

During the early morning hours of December 3, 2020, Gerardo Padilla ("Padilla") left work and began driving home where he lived with his father and two younger sisters. After he parked his father's van in the driveway and began exiting the vehicle, two men appeared and pushed him up against the van. Padilla testified that both assailants pointed a gun at the back of his head. When Padilla tried to scream for help, the assailants told him to stay quiet or they would pull the trigger. The assailants searched Padilla's pockets, took his AirPods, and drove away in the van. Padilla testified that he had feared for his life.

Houston Police Department ("HPD") Officer M. Daily was on patrol when he received information about two people driving a van in connection with an aggravated robbery. Officer Daily spotted appellant and his accomplice driving a van that matched the description of the stolen vehicle and signaled for them to pull over. Instead, they led him on a high-speed chase for more than two miles, reaching speeds of more than ninety miles per hour and running a red light and a stop sign,

before they stopped and attempted to flee on foot.[1]  Appellant and his accomplice were eventually apprehended.

HPD Officer L. Herrington arrived at the location of the incident and spoke with Padilla.  He testified that Padilla was very emotional.  He took Padilla to the location where appellant and his accomplice had been apprehended for identification.  Padilla identified the accomplice as one of the two individuals who had pointed a gun at him.  Padilla also identified appellant, whom he recognized as a high school classmate, stating "[t]hat's Joel Moore who also pointed a gun at me."

The jury found appellant guilty of aggravated robbery with a deadly weapon and evading arrest with a motor vehicle.

In the State's opening statement during the punishment phase, one of the prosecutors told the jury:

> Joel Moore is in jail for murder right now.  This was just one piece of the puzzle.  Now you guys have the full range of punishment.  You get to consider all the bad things Joel Moore has done.

Without first asking for an instruction to disregard, appellant's counsel moved for a mistrial, arguing that the murder charge against appellant had been dismissed and appellant was not in jail for murder.  The trial court denied the motion.

---

[1]     The State introduced the officer's dash cam video of the high-speed chase into evidence.

During the punishment phase, the State presented evidence that appellant had committed the following four extraneous offenses:

- Aggravated assault with a deadly weapon on September 24, 2020

- Aggravated assault with a deadly weapon on July 28, 2021

- Aggravated assault with a deadly weapon on August 19, 2021

- Murder of Guadalupe Rico ("Guadalupe") on August 20, 2021

As part of its presentation regarding the murder charge, the State called the decedent's sister, Maria Ibarra ("Ibarra"), to testify. Appellant's counsel objected on the grounds that that the testimony was cumulative, constituted improper victim impact testimony, and the case had been dismissed. The trial court overruled the objection.

The State presented evidence that appellant had masturbated in front of two detention officers while in jail. The jury also heard evidence about appellant's various disciplinary infractions, which included assaulting a detention officer while in jail.

After both sides rested, the jury assessed appellant's punishment at seventy-five years' confinement and a $10,000 fine for the aggravated robbery offense and ten years' confinement and a $10,000 fine for the evading arrest offense.

## Standard of Review

A trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard. *Valadez v. State*, 663 S.W.3d 133, 143 (Tex. Crim. App. 2022). A trial court's denial of a motion for mistrial is also reviewed for an abuse of discretion. *See Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). A trial court abuses its discretion if its evidentiary ruling lies outside the zone of reasonable disagreement. *Valadez*, 663 S.W.3d at 143. If the trial court's evidentiary ruling falls within the zone of reasonable disagreement under any applicable legal theory, we will not intervene, even if the trial court gave an improper justification for its ruling. *De la Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

## Admission of Ibarra's Testimony

In his first issue, appellant contends that the trial court erred when it allowed Ibarra to provide victim impact testimony[2] during the punishment phase regarding the murder of her brother, Guadalupe. He asserts that the admission of this

---

[2] "Victim impact" evidence is evidence concerning the effect of the crime after the crime occurs. *See Hayden v. State*, 296 S.W.3d 549, 553 (Tex. Crim. App. 2009) ("Victim 'impact' evidence is evidence of the effect the victim's death has on other people."); *Haley v. State*, 173 S.W.3d 510, 517 (Tex. Crim. App. 2005) ("Victim-impact evidence is evidence concerning the effect the victim's death will have on others, particularly the victim's family members . . . ."). Generally, this evidence is admissible at the punishment phase and not the guilt-innocence phase because it does not tend to make more or less probable the existence of any fact of consequence with respect to guilt or innocence. *See Love v. State*, 199 S.W.3d 447, 456 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd).

extraneous offense evidence about a dismissed charge denied him a fair punishment hearing.  The State responds that Ibarra's testimony was admissible because it was relevant and its probative value was not significantly outweighed by any unfair prejudice.  It asserts that even if the trial court erred in allowing her testimony, the error was harmless because appellant would have likely received the same sentences without her testimony.

Article 37.07 of the Texas Code of Criminal Procedure provides, in pertinent part:

> [E]vidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to . . . any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

TEX. CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1).  "Evidence is relevant if: (a) it has any tendency to make a fact issue more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  TEX. R. EVID. 401.  While "Rule 401 is helpful for determining what evidence should be admitted under Article 37.07, § 3(a), [] it is not a perfect fit in the punishment context."  *Ex parte Lane*, 303 S.W.3d 702, 714 (Tex. Crim. App. 2009).  "Determining what is relevant at the punishment stage is a question of 'what is helpful to the jury in determining the appropriate sentence for a particular defendant

in a particular case.'" *Id.* (quoting *Rogers v. State*, 991 S.W.2d 263, 265 (Tex. Crim. App. 1999)). Evidence that is relevant to the determination of a sentence may still be excluded if the danger of unfair prejudice substantially outweighs its probative value. *See* TEX. R. EVID. 403.

When the State called Ibarra to testify, defense counsel objected and the following exchange took place:

Prosecutor: The State calls Maria Ibarra to the stand.

. . . .

Prosecutor: She's just here to identify the complainant.

. . . .

Defense Counsel: Well, Your Honor, the other thing I object to is cumulative. The complainant has been identified already.

The Court: No, he hasn't.

Defense Counsel: The M.E. identified him.

The Court: No, he didn't. You can go back and check, but the M.E. never identified him.

Defense Counsel: I'm pretty sure I heard her say the victim's name.

The Court: Okay. State, do you want to be heard on the matter?

Defense Counsel: I'm a hundred percent sure she identified –

Prosecutor: Judge, we need the next of kin to identify the photo that was used in the medical examiner's autopsy. In addition, it is not cumulative.

This is a punishment case. We are allowed to put on family members of the decedent, in addition to an essential element of a crime that we are putting on in punishment.

Defense Counsel: Well, Your Honor, again, I have had this situation come up before where the State will, of course, present some future loved one shot or something and a loved one gets on the stand and gets all emotional, of course, to influence the jury.

The victim has been identified by the pictures and the M.E.'s report. If we are talking about identification, that has been done.[3]

The Court: Okay. I don't think that the victim has been identified; but, secondary, this is punishment.

Defense Counsel: Yes, I understand, Judge. The rules apply, though, Your Honor.

The Court: The rules do apply, but they also get to talk about the victim and the impact of the family; and this witness will testify to it.

Defense Counsel: All right. Well, Your Honor, I further object on the ground that this case is the agg robbery case; and so we are talking about a victim in a case that has been dismissed. I'm not sure she qualifies as a victim in an impact statement with respect to a case that's been dismissed.

I'm just – I just think the evidence is cumulative, and it serves no purpose other than to inflame the emotions of the jury.

The Court: Your objection is overruled.

Ibarra testified that she was there to get justice for her brother. She described

Guadalupe as a family man and responsible father. Ibarra testified that she looked

---

[3]     When the medical examiner was shown a photo taken during the autopsy, she confirmed that it was a photo of the decedent, Guadalupe Rico.

8

up to her brother when they were children, they had done karate together, and her brother had taught her to dance. Ibarra testified that her brother had three young children, and that his twins asked about their father a lot. She testified that his death has impacted their mother, who is still grieving and unable to work. Ibarra testified that she gets emotional when she thinks of her brother and has to stop herself from texting him through Facebook Messenger. Ibarra testified that she was diagnosed with post-traumatic stress disorder after her brother's murder. Ibarra identified her brother in the photo admitted as State's Exhibit 57.

Appellant argues that Ibarra's testimony was irrelevant and only served to inflame the jury and unduly prejudice him. He argues that although he was charged with aggravated robbery, the punishment phase of the trial focused on the dismissed murder charge. According to appellant, any relevance the extraneous offense evidence had was far outweighed by its prejudicial effects.

In support of his argument, appellant directs us to *Cantu v. State* and *Boston v. State*. In *Cantu*, a capital murder case, the defendant participated in the kidnapping, robbery, aggravated sexual assault, and killing of two victims. 939 S.W.2d 627, 630–31 (Tex. Crim. App. 1997). The indictment named only one of the victims. *See id.* at 630. Victim impact testimony was elicited from the mother of the victim not alleged in the indictment during the sentencing phase. *See id.* at 635–36. The mother testified about the second victim's character, the activities she

9

enjoyed, her relationships with her family, and the effect of the victim's death on the rest of the family. *See id.* at 636. The Court of Criminal Appeals concluded that victim impact evidence regarding the second victim was not relevant because the defendant was not on trial for her murder and the evidence served no purpose other than to inflame the jury. *See id.* at 637 (concluding extraneous offense victim impact evidence was inadmissible because "[t]he danger of unfair prejudice to a defendant inherent in the introduction of 'victim impact' evidence with respect to a victim not named in the indictment on which he is being tried is unacceptably high.").[4] The Court determined, however, that the erroneous admission of the victim impact testimony was harmless beyond a reasonable doubt. *See id*. at 637–38.

In *Boston v. State*, the defendant was convicted of aggravated robbery. 965 S.W.2d 546, 548 (Tex. App.—Houston [14th Dist.] 1997, no pet.). During the punishment phase of trial, the State introduced evidence of an unadjudicated aggravated robbery allegedly committed by the defendant. *See id.* at 550. After describing the details of the robbery, the victim of the unadjudicated offense testified

---

[4]    Following its holding in *Cantu*, the Court of Criminal Appeals later disapproved a trial court's decision to permit punishment phase evidence in a drug possession case of a mother regarding the loss of her daughter in an extraneous murder. *See Haley*, 173 S.W.3d at 518. In holding that the victim impact testimony was irrelevant, the Court noted that the defendant had faced an indictment that did not identify a victim and, therefore, "victim-impact and victim-character testimony regarding an extraneous offense or bad act was irrelevant under Rule 401 to the determination of the appropriate sentence [the defendant] should receive on the facts of [that] case." *Id*.

that since the robbery, she had developed problems sleeping, had nightmares, was very nervous, and was afraid to stay home alone. *Id.* The Fourteenth Court of Appeals, relying on *Cantu,* held that the trial court erred in admitting extraneous offense victim impact evidence from the victim of the unrelated and unadjudicated robbery allegedly committed by the defendant. *See id.* The court concluded, however, that admission of the testimony was harmless and did not warrant reversal. *See id.* at 550–51.

The State asserts that *Cantu* and *Boston* are distinguishable from this case because in neither case was the victim's character impeached before the witness gave an impact statement. Here, by contrast, defense counsel repeatedly attacked Guadalupe's character before Ibarra took the stand, labeling him a fool, thief, a bad father, and a liar, and Ibarra testified only after multiple attacks on Guadalupe's character. *See Cantu*, 939 S.W.3d at 637 ("[I]t has long been the law in Texas that evidence of a deceased's good and peaceful character is not admissible unless and until that character is placed in issue by the defendant."). The State points to the following testimony by witnesses called before Ibarra:

- "[Y]ou are saying that what Juan and Guadalupe did, that was just foolish? . . . So you are saying that Guadalupe was just a foolish man?"

- "Did you know that [Guadalupe] stole cars?"

- And you don't know what [Guadalupe] does with his weapon when he's in the house, do you? . . . You don't know if he shows his kids the weapon or

11

not, do you? . . . So you don't know whether he showed his kids the weapon or not, do you?"

The State argues that Ibarra's testimony was therefore relevant to counter defense counsel's attacks on Guadalupe's character. It further asserts that the probative value of Ibarra's testimony greatly outweighed any possible prejudice as it also (1) identified Guadalupe, (2) showed appellant's willingness to engage in gun violence and endanger other lives, and (3) connected to the State's evidence showing appellant committed other violent crimes involving guns.

Appellant argues that, to the extent Ibarra's testimony was relevant, any relevance was far outweighed by its prejudicial effects. He argues that by introducing Ibarra's testimony, the State wanted the jury to punish appellant not for the crime they found him guilty of—aggravated robbery with a deadly weapon—but for the dismissed charge of murder. He argues that they elicited Ibarra's testimony solely to inflame the jury as shown by the fact that they never put Padilla, the actual victim of the charged offense, on the stand during the punishment phase. According to appellant, Ibarra's testimony was precisely the type of testimony cautioned against by the Court in *Cantu* when it concluded that "[t]he danger of unfair prejudice to a defendant inherent in the introduction of 'victim impact' evidence with respect to a victim not named in the indictment on which he is being tried is unacceptably high." *Id.*

Assuming that the trial court erred in allowing Ibarra's testimony, we conclude that the admission of her testimony was harmless. The erroneous admission of evidence is non-constitutional error. *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018). Non-constitutional errors are harmful, and thus require reversal, only if they affect an appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b). An error affects substantial rights only when it has a substantial and injurious effect or influence in determining the jury's verdict. *Gonzalez*, 544 S.W.3d at 373. If we have a fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but a slight effect, we will not overturn the conviction. *Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008). In making this determination, we consider: (1) the character of the alleged error and how it might be considered in connection with other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence indicating guilt; and (4) whether the State emphasized the complained-of error. *Gonzalez*, 544 S.W.3d at 373.

The record shows that Ibarra was one of seventeen State's witnesses who testified at punishment—and one of seven witnesses who specifically testified about Guadalupe's murder—and her full testimony before the jury comprised less than twenty-five pages out of over 700 pages of testimony at punishment, with her victim impact testimony comprising around ten pages. As described above, Ibarra testified

13

about the things she did with Guadalupe, that Guadalupe had three young children and his twins asked about him a lot, that Guadalupe's death had impacted their mother who was still grieving and unable to work, and that Ibarra had been diagnosed with post-traumatic stress disorder and that she became emotional when she thought about him. But this was not the only victim impact testimony provided, and other victim impact testimony came in largely without objection (and none of which appellant complains about on appeal).

For example, another witness who was Guadalupe's friend and had knowledge about the shooting incident testified that Guadalupe had three young children, which included twins, and "was a good friend, a good father, a hard worker. You tell him to stop, he's going to do extra. Put the jacket down on the water for you to walk over it. You know, very supportive, very supportive," and he cared about his "neighborhood and family." The witness explained that Guadalupe's wife came to the scene where he was shot and her emotions were "[t]errifying, shocked, adrenaline." The witness testified that Guadalupe and his wife had been married since high school, and they had a happy marriage. The witness described how Guadalupe's death had impacted him "mentally, spiritually," that he "[c]an't sleep good at night sometimes," that he "basically lost [his] friendship with God because, you know, why did this happen," and that "[i]t just hurts because [Guadalupe is] not there for his twins or his older son." This witness stated that he attended

Guadalupe's funeral, and that Guadalupe's older child and over thirty of Guadalupe's family members were emotional at the funeral. The witness further testified:

Q. Did it appear to you that Guadalupe Rico had a profound affect [sic] on all of the people at that funeral?

A. He did.

Q. And how so?

A. Just everybody speaking highly about him; his cousins, aunts, uncles.

Q. And since Guadalupe was murdered, have you had the chance to observe his family?

A. I haven't, sir.

Q. Do you see members of his family in the courtroom today?

A. Yes, I do.

Q. And when you go home at night and close your eyes, do you ever have a chance to see the horrors that you saw back then?

A. Yes, I still do.

Q. And what do you see when you close your eyes?

A. Guadalupe laying on the floor.

Another witness, who was Guadalupe's brother-in-law and also had knowledge about the shooting, testified about Guadalupe's children. This witness and Guadalupe approached appellant on the day of the shooting because he looked suspicious, and the witness and Guadalupe "always have our kids running around,

15

so like right now, we could have been here fighting a murder case for a kid, or something, instead of for a grown-up." This witness testified:

Q. And what about – how many children did Guadalupe have?

A. He has three children.

Q. How has it affected them?

A. Really bad. Their dad was their hero. He would do anything for those kids. He was a real hard-working man.

Q. What about the rest of the family? How has it affected them?

A. Bad, sir. We are all affected by it. He would give you the shirt off his back if he could.

Q. And if you could describe Guadalupe in one word, what would that word be?

A. A hero. He was an incredible person.

The State presented ample evidence during punishment that appellant had committed three other violent crimes, specifically three aggravated assaults with a deadly weapon (all involving guns), as well as evidence of appellant's disciplinary history while in jail, which included his assault of a detention officer.

The nature of the evidence supporting the jury's verdicts was strong. Padilla recognized appellant as a high school classmate and identified him as one of his assailants who put a gun to his head while robbing him. Police officers testified that appellant failed to stop the vehicle when instructed, led them on a high-speed chase, and attempted to flee on foot, only surrendering when he was cornered by police.

16

The jury was also presented with Officer Daily's dashcam video of the pursuit. In it, they observed firsthand appellant's reckless driving—which included speeding at more than ninety miles an hour and running a red light and a stop sign—which endangered other drivers and pedestrians. The record also shows that during the punishment phase defense counsel told the jury that he did not put on a defense to the charged offenses because "there was no defense," and he "didn't want to waste their time" with a vigorous cross-examination of witnesses regarding the two charged offenses.

Lastly, the State only specifically referred to Ibarra's testimony twice during its closing (noting Ibarra took the stand because their mother was unable to testify about Guadalupe's death and that Ibarra lost her dance partner in Guadalupe) and spent much more time detailing appellant's numerous offenses. And, even without Ibarra's testimony, the jury could still consider the evidence that appellant murdered Guadalupe. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1); *see also Boston*, 965 S.W.2d at 551 (noting evidence that defendant robbed victim of extraneous offense and threatened her family with knife, which was admissible, would naturally imply detrimental impact). Moreover, the State argued, "I want you to consider how this poor family has been dealing with the loss of a loved one," "I want you to consider Guadalupe. A father, a son, a person who just wanted to love his family," "Lupe left behind all these people here," and "Lupe will never have the chance for

17

his daughter to grab out and reach out for him"—things about which other witnesses testified and that appellant does not complain about on appeal.

When viewed in the context of all the punishment evidence, it does not appear that the State unduly emphasized Ibarra's testimony and that the jury could consider significant other victim impact testimony that was not objected to. Finally, we note that although appellant's seventy-five-year sentence and $10,000 fine for aggravated robbery[5] with a deadly weapon and ten-year sentence and $10,000 fine for evading arrest with a motor vehicle[6] fall at the high end of the punishment range for the offenses, they are nonetheless within each range.[7]

Having reviewed the record as a whole, we have a fair assurance that the admission of Ibarra's testimony either did not influence the jury or had but a slight effect. *See* TEX. R. APP. P. 44.2(b). We overrule appellant's first issue.

---

[5] Aggravated robbery with a deadly weapon is a first-degree felony carrying a maximum sentence of ninety-nine years or life in prison and a fine of up to $10,000. *See* TEX. PENAL CODE ANN. §§ 12.32(a-b), 29.03(b).

[6] Evading arrest with a motor vehicle is a third-degree felony carrying a maximum sentence of ten years in prison and a fine of up to $10,000. *See* TEX. PENAL CODE ANN. §§ 12.34(a-b), 38.04(b)(2)(A).

[7] In his closing argument during punishment, defense counsel referenced appellant's conviction for aggravated robbery, acknowledging "that one alone could get him a lot of time, really."

## Motion for Mistrial

In his second issue, appellant contends that the trial court erred by denying his motion for a mistrial after one of the prosecutors told the jury that appellant was "in jail for murder" during opening statements of the punishment phase. He asserts that the inflammatory statement was not only untrue but likely affected his punishment.

In his opening statement during the punishment phase, one of the prosecutors told the jury:

> Prosecutor: Joel Moore is in jail for murder right now. This was just one piece of the puzzle. Now you guys have the full range of punishment. You get to consider all the bad things Joel Moore has done.
>
> Defense Counsel: Your Honor, may we approach briefly?
>
> (At the Bench, on the record)
>
> Defense Counsel: Judge, I'm going to move for a mistrial. He says my client is in jail for murder. That's just not true. That case has been dismissed.
>
> The Court: You can make your objection.
>
> Defense Counsel: Judge, I move for a mistrial. That is so – I just don't understand why he said that my client is in jail for murder, and that charge has been dismissed. He's not in jail for murder.
>
> The Court: If you are making your objection based off of that, I will sustain your objection; but I'm going to deny your motion for mistrial. You dismissed this case. He can bring it up in punishment. You can't say it's not murder because you dismissed that case.
>
> Prosecutor: Understood, Judge.

Defense Counsel: Can I make a bill on this, Judge?

The Court: What is the bill?

Defense Counsel: The bill is that they have basically blatantly said something that is just not true and I think it's going to be highly prejudicial to my client and I don't think we can recover from it. I mean, murder is major.

The Court: Is there anything else that you want to put on the record?

Defense Counsel: Other than that, I move for a mistrial, Judge.

The Court: That will be denied.

A mistrial is a remedy for improper conduct that is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Hawkins*, 135 S.W.3d at 77 (quotations omitted); *see Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009) ("A mistrial is an appropriate remedy in 'extreme circumstances' for a narrow class of highly prejudicial and incurable errors."). This is an "extreme remedy" that halts trial proceedings, and therefore a trial court should grant a mistrial "only when residual prejudice remains after less drastic alternatives are explored." *Ocon*, 284 S.W.3d at 884–85 (quotations omitted). We consider the particular facts of the case when determining whether an error requires a mistrial. *Id.* at 884.

The usual sequence to preserve for appellate review the denial of a mistrial due to improper prosecutorial argument is an objection, an instruction to disregard, and a motion for mistrial. *See Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). However, this sequence is not essential to preserve error. *See id.* For

instance, a request for an instruction to disregard is essential only when such an instruction could have had the desired effect, which is to enable the continuation of the trial by an impartial jury. *Id.* (quoting *Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim. App. 2004)). Thus, a party who fails to request an instruction to disregard will have forfeited appellate review of that class of events that could have been cured by such an instruction; but if an instruction could not have had such an effect, the only suitable remedy is a mistrial, and a motion for a mistrial is the only essential prerequisite to presenting the complaint on appeal. *See Young*, 137 S.W.3d at 70.

An instruction to disregard is presumed to cure the harm. *Weatherby v. State*, 61 S.W.3d 733, 737 (Tex. App.—Fort Worth 2001, pet. ref'd) (citing *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000)). "Indeed, '[a]lmost any improper argument may be cured by an instruction to disregard.'" *Williams v. State*, 417 S.W.3d 162, 175–76 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (citation omitted). If the instruction cured any harm caused by the improper argument, a reviewing court should conclude that the trial court did not err. *See Weatherby*, 61 S.W.3d at 737 (citing *Dinkins v. State*, 894 S.W.2d 330, 357 (Tex. Crim. App. 1995)). Only if the reviewing court determines that the instruction was ineffective does the court go on to determine whether the error was harmful. *Id.*

Here, appellant did not request a curative instruction. And, in his brief on appeal, he makes no argument that the prosecutor's statement could not have been

cured by such an instruction. *See* TEX. R. APP. P. 38.1(i). Thus, he failed to rebut the presumption that such an instruction would have cured the harm from the prosecutor's statement. *See Castaneda v. State*, 694 S.W.3d 13, 20 (Tex. App.—Houston [14th Dist.] 2023, no pet.); *Williams*, 417 S.W.3d at 176; *see also Rodriguez v. State*, No. 12-25-00033-CR, 2025 WL 2492059, at *2 (Tex. App.—Tyler Aug. 29, 2025, no pet.) (mem. op., not designated for publication).

However, even if appellant had rebutted the presumption, he has failed to show that the trial court abused its discretion in denying his motion for mistrial. To determine whether prejudice is incurable, we apply a three-factor balancing test. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998). We consider (1) the severity of the misconduct (the magnitude of the prejudicial effect of the remark); (2) the curative measures taken (the efficacy of any cautionary instruction by the judge); and (3) the certainty of the conviction—or, in this case, punishment—absent the misconduct (the strength of the evidence supporting the punishment). *Id.* In evaluating the severity of the misconduct, we assess "whether [the] jury argument is extreme or manifestly improper [by] look[ing] at the entire record of final arguments to determine if there was a willful and calculated effort on the part of the State to deprive [appellant] of a fair and impartial trial." *Brown v. State*, 270 S.W.3d 564, 573 (Tex. Crim. App. 2008) (internal quotation omitted).

22

With regard to the first factor—the severity of the conduct—the prosecutor made a single statement that appellant was in jail for murder. He did not state that appellant was convicted of murder or encourage the jurors to view evidence of the murder case in the same way as a conviction.

As to the second factor, the record shows that the trial court as well as the State took steps to cure any prejudice from the statement. The trial court sustained appellant's objection before the jury, explicitly stating that the murder charge had been dismissed. Further, after counsel objected to the statement, the prosecutor did not offer any defense or otherwise attempt to counter defense counsel's objection; instead, he verbally acknowledged the trial court's ruling sustaining the objection, stating "Understood, Judge," and did not make the statement again. Immediately following this exchange, the prosecutor stated to the jury that appellant "was involved in a murder where he was indicted at one point for that charge." This amounted to some curative action by the prosecutor. *See Hawkins*, 135 S.W.3d at 84 ("Although a prosecutor's self-corrective action might not carry the same weight as a trial court's instruction to disregard, it is nevertheless a relevant consideration in determining harm and can, in the appropriate circumstances, render an improper comment harmless."); *see also Cruz–Garcia v. State*, No. AP–77,025, 2015 WL 6528727, at *22 (Tex. Crim. App. 2015) (not designated for publication) (noting that although trial court did not take any steps to cure prosecutor's alleged error injecting

her opinion into closing argument, prosecutor's immediate rephrasing of her statement was quasi-curative measure that worked in favor of error being harmless).

Moreover, appellant's counsel made clear during opening statements: "The prosecutor just said something that is just patently false. [Appellant] is not in jail for murder. That's just not true. The evidence will show that." Appellant's counsel later examined witnesses who testified that they understood that appellant was not charged with murder or that the State had dismissed the murder charge. The State introduced into evidence its motion to dismiss the murder charge, which reflected the reason for the dismissal as "State intends to use as punishment evidence." And appellant introduced the document reflecting that the complaint in the murder case had been dismissed.

The third factor we consider is the certainty of the punishment absent the misconduct. As discussed above, appellant's sentences fall with the statutory range for each offense. Defense counsel told the jury that he did not put on a defense to the charged offenses because there was none. He also told the jury in closing arguments that appellant's "[conviction for aggravated robbery] alone could get him a lot of time," and that it was up to the jury to decide his sentence. The jury was presented with the testimony of seven witnesses that appellant murdered Guadalupe. The jury also heard evidence that appellant had committed three other violent crimes and repeatedly committed disciplinary infractions, including assaulting a detention

officer, while in jail. There was ample evidence supporting appellant's sentences. Accordingly, we hold that the trial court did not abuse its discretion in denying appellant's motion for mistrial. Appellant's second issue is overruled.

## Conclusion

We affirm the trial court's judgments.


Kristin Guiney
Justice

Panel consists of Justices Guerra, Guiney, and Johnson.

Do not publish. TEX. R. APP. P. 47.2(b).